**MASSACHUSETTS MUSEUM OF CONTEMPORARY ART FOUNDATION, INC., Plaintiff**

v.

**Christoph BÜCHEL, Defendant.**

**C.A. No. 07–30089–MAP.**

United States District Court, D. Massachusetts.

July 11, 2008.

Kurt W. Hemr and Paula-Marie Uscilla, Boston, MA, and John L. Gardiner, Elizabeth A. Hellmann, Skadden, Arps, Slate, Meagher & Flom LLP, New York, NY, for Massachusetts Museum of Contemporary Art Foundation, Inc.

Mark M. Elliott, New York, NY, and Jonathan M. Albano and Carol E. Head, Bingham McCutchen LLP, Boston, MA, for Christopher Büchel.

*MEMORANDUM AND ORDER REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT (Dkt. Nos. 28 & 32)*

PONSOR, District Judge.

## I. INTRODUCTION

In early 2006, Plaintiff Massachusetts Museum of Contemporary Art Foundation, Inc. ("MASS MoCA" or "the museum") and Defendant Christoph Büchel agreed orally to work together on the construction of an enormous art installation, roughly the size of a football field, broadly conceived by Büchel and entitled "Training Ground for Democracy." For most of 2006 MASS MoCA, at its own expense,

acquired and installed nearly all the components of the mammoth exhibition, attempting to follow the largely-absent artist's general instructions.

During the latter stages of the work's fabrication, disputes between the artist and the museum staff, mainly via e-mail, grew bitter. In summary, the museum felt the artist's directions were vague, and his financial and logistical demands were increasingly unreasonable; the artist felt the museum was compromising his artistic integrity and failing to follow his instructions. By early January 2007 Büchel was threatening to terminate his role in the project unless certain specific terms were met. Negotiations followed, but by the spring of 2007 the relationship had broken down, and Büchel informed the museum of his final decision to abandon "Training Ground for Democracy." The installation, by now more than eighty percent completed, was covered with tarpaulins, and there it sat. At one point museum visitors were directed past it, on their way to another exhibit in the same building.

Eventually, MASS MoCA made the decision (later reversed) that it wished to remove the coverings and show the partially finished installation, if legally permissible. On May 21, 2007, therefore, MASS MoCA filed a one-count complaint in this court, seeking a declaratory judgment that it was "entitled to present to the public the materials and partial constructions assembled in connection with the exhibit planned with Büchel." (Dkt. No. 1, Compl. 7.)

Büchel responded with a counterclaim offering five counts. In Count I, he sought (a) a declaratory judgment holding that *any* public display of the unfinished installation would violate his rights, and (b) a permanent injunction barring any such public display, all based upon the Visual Artists Rights Act ("VARA"), 17 U.S.C. § 106A. In Count II, also pursuant to

VARA, he claimed monetary damages (a) resulting from the museum's decision to allow patrons to walk past the installation while under tarpaulins, on the grounds that this constituted a form of exhibition and distorted his work, and (b) resulting from museum staff working on the installation without his supervision. In Count III, he sought damages because, he said, MASS MoCA's alleged display of the covered installation materials also violated the Copyright Act, 17 U.S.C. § 106(5), by appropriating his exclusive right to exhibit his artwork publicly. Finally, in Counts IV and V, he contended that he was entitled to damages under 17 U.S.C. § 106(2), which gives an artist the exclusive right to create "derivative" works based either upon the copyrighted original work, or upon that work's model and plans. In his prayers for relief, in addition to a declaratory judgment, a permanent injunction and monetary damages, Defendant sought an order from the court commanding MASS MoCA to destroy the installation and remove its components from the museum at its own expense.

The parties agreed to a tight schedule for preliminary proceedings, leading up to the filing of cross motions for summary judgment and supporting memoranda by September 14, 2007. On September 18, the court visited the premises of MASS MoCA in North Adams, Massachusetts, and conducted a view of the unfinished installation, first while covered and then with the coverings removed.

On September 21, 2007, counsel appeared for argument on the cross motions for summary judgment. Plaintiff MASS MoCA sought a declaration that its exhibition of the materials as assembled would not offend VARA or any other provision of the Copyright Act. It also sought judgment in its favor on Defendant's five counterclaims. Büchel for his part sought im-

mediate injunctive relief on Count I of his counterclaim, barring the museum from exhibiting what he contended was an unfinished work of art belonging entirely to him. He also sought summary judgment with regard to liability on the other four counts of his counterclaim.

Based on the parties' desire for a prompt decision, the court ruled orally immediately following argument on the two most pressing matters.

First, the court allowed Plaintiff's motion for declaratory relief, holding, in the unique circumstances of this case, that nothing in VARA or elsewhere in the Copyright Act prohibited the museum from exhibiting the partially completed installation. This declaration was contingent on a posted disclaimer that would inform museum patrons that the exhibit constituted an unfinished project that did not fully carry out the installation's original intent. The museum's notice was to make no mention of Christoph Büchel's name in association with the exhibit. Büchel was given a period of time to suggest his own language to be included in the disclaimer, if he wished, including any description of his involvement with the project or his disavowal of any responsibility for it.

Second, the court correspondingly denied Defendant's motion for injunctive relief barring public display of the unfinished installation on the well-trodden ground that Defendant had failed to show a likelihood of success on the merits. *See Naser Jewelers, Inc. v. City of Concord*, 513 F.3d 27, 32, 37 (1st Cir.2008). Apart from the two oral rulings on the complaint for declaratory relief and Count I of the counterclaim, the court took the cross motions for summary judgment on Counts II–V of the counterclaim under advisement with the understanding that this written memorandum would follow.

Within a few days of the court's oral rulings, Mass MoCA announced a change in its position, stating that, despite the court's judgment that it was legally entitled to do so, it would *not* be exhibiting the unfinished installation to the public, and that it intended to dismantle the exhibit and distribute its contents to charities or transport them to the local landfill. Following this, Büchel's attorneys withdrew their appeal of the court's oral rulings.

It is clear, in light of the museum's decision, that many of the issues raised by this case are now moot. Nevertheless, this memorandum is intended to set forth in more comprehensive form the reasons for the court's two preliminary oral rulings and to address the parties' cross motions for summary judgment on the remaining counts of Büchel's counterclaim. For the reasons set forth below, the court will rule in favor of Plaintiff MASS MoCA on all counts.

Put simply, the court's holding is this. When an artist makes a decision to begin work on a piece of art and handles the process of creation long-distance via e-mail, using someone else's property, someone else's materials, someone else's money, someone else's staff, and, to a significant extent, someone else's suggestions regarding the details of fabrication—with no enforceable written or oral contract defining the parties' relationship—and that artist becomes unhappy part-way through the project and abandons it, then nothing in the Visual Artists Rights Act or elsewhere in the Copyright Act gives that artist the right to dictate what that "someone else" does with what he has left behind, so long as the remnant is not explicitly labeled as the artist's work. No right of artistic "attribution" or "integrity," as those terms are conceived by VARA, is implicated, let alone violated in these circumstances. Similarly, the Copyright Act provides no

mechanism for relief, legal or equitable, to an artist such as Defendant Büchel here, based on the decision of an exhibitor such as Plaintiff MASS MoCA to allow patrons to walk past covered components of an unfinished installation.

Having said this, the undersigned (as one of the very few people to see the nearly completed "Training Ground for Democracy") must add a rare personal observation. This is a sad case. As a result of a possibly avoidable breakdown in the relationship between the parties, a substantial work of art that might well, if completed, have powerfully touched many people has been scattered to the four winds. Despite the comedic elements of this particular brouhaha, something barbaric always adheres to the deliberate destruction of a work of art—even one that is not quite finished.[1] Since responsibility for the collapse of this creative initiative, like responsibility for its partial completion, was shared by the museum and the artist, one is tempted to wish a plague on both their houses. But it is probably more apt to say: what a shame.

## II. FACTUAL BACKGROUND [2]

MASS MoCA is a museum specializing in the display of contemporary art, located in North Adams, Massachusetts. The museum is notable for its "Building 5," a giant exhibition space the size of a football field. In October 2005, the Swiss artist Christoph Büchel visited MASS MoCA to discuss the possibility of creating a very large art installation to be shown in Building 5. By early 2006, MASS MoCA had formally invited Büchel to create an exhibition in the space, and he agreed.

Büchel envisioned the work, to be entitled "Training Ground for Democracy," as essentially a village, ... contain[ing] several major architectural and structural elements integrated into a whole, through which a visitor could walk (and climb). It was to adopt the role-play of U.S. military training for its visitors, who would be given the opportunity to "virtually" change their own various identities in relation to the collective project called "democracy": training to be an immigrant, training to vote, protest, and revolt, training to loot, training iconoclasm, training to join a political rally, training to be the objects of propaganda, training to be interrogated and detained and to be tried or to judge, training to reconstruct a disaster, training to be in conditions of suspended law, and training various other social and political behavior.

(Dkt. No. 32, Büchel's Mot. for Summ. J. and Local Rule 56.1 Statement of Undisputed Material Facts ¶ 5.)

---

**1.** The public as the beneficiary of great art has its own legitimate interest in preservation, which sometimes can trump the artist's will. The Roman poet Virgil is supposed to have instructed his executor to destroy the manuscript of *The Aeneid* after his death; Franz Kafka apparently also requested that his writings be destroyed when he died. Fortunately for the world, these instructions were disregarded. In May of this year the New York Times reported that Dmitri Nabokov would publish the manuscript of the last novel of his father Vladimir, tentatively entitled "The Original of Laura," despite the author's instruction to burn it. Steve Coates, *His Father's Siren, Still Singing*, N.Y. Times, May 4, 2008, at WK5. A less fortunate outcome deprived the world of the score of Jean Sibelius' Eighth Symphony, a likely masterpiece that the composer burned some time in the 1940's. Alex Ross, *Apparition in the Woods*, The New Yorker, July 9–16, 2007, at 51–58.

**2.** Unless otherwise noted, these facts are taken from Dkt. No. 30, Pl. MASS MoCA's Local Rule 56.1 Statement of Material Facts, and Dkt. No. 32, Büchel's Mot. for Summ. J. and Local Rule 56.1 Statement of Undisputed Material Facts. Any factual disagreements between the parties are also noted in this summary.

At various points in the development of the installation, Büchel proposed several major components, including a movie theater interior, a house, a bar, a mobile home, several sea cargo containers, a variety of vehicles, an aircraft fuselage, and a bomb carousel. Some but not all of those objects eventually became part of "Training Ground for Democracy," as its elements evolved through discussions with MASS MoCA during the construction process.

Regrettably, the parties did not formalize the details of their relationship in any signed written instrument, or even through any clear oral understanding. Joseph Thompson, Director of MASS MoCA, did send a copy of the museum's "standard" contract to Büchel's representative in the United States, Michele Maccarone,[3] on September 14, 2006. (Dkt. No. 31, Ex. 16.) That document did not lay out any definitive budget for the project, but it did provide that the installation would be turned over to Büchel, after its completion and exhibition at the museum, for a possible tour around the country. In this eventuality, the museum expressed hope that it would be repaid for its expenses in creating the work. Maccarone responded with a proposed contract of her own, advising that MASS MoCA should shoulder the costs of organizing, transporting, and assembling the materials for the exhibit. (Dkt. No. 44, Ex. 20.) Büchel never saw or assented to the MASS MoCA proposal, and the museum likewise did not respond to Maccarone's suggestions. Additionally, Büchel never signed any waiver regarding his rights under the Visual Artists Rights Act.

Instead, the arrangements between the two parties were negotiated on an *ad hoc* basis. At preliminary meetings during Büchel's visit to MASS MoCA from August 21–30, 2006, some tentative plans were made regarding the content of the exhibit, and the parties scheduled an opening date of December 16, 2006. MASS MoCA agreed to undertake acquisition of the various materials needed for the installation at the direction of Büchel. On this visit Büchel created a basic model and general plans for the installation. Only after construction was well under way in November 2006 did one of Büchel's assistants prepare a somewhat more detailed architectural schematic.

The parties dispute whether their initial discussion of costs included a commitment by MASS MoCA to assume all expenses of the installation or whether MASS MoCA explained to Büchel that it had limited budgetary resources and might not be able to fund the full project. The museum did propose an initial estimated cost of $160,000 in September 2006, though the possibility of additional funds from outside donors (versus resources directly from MASS MoCA's internal budget) was left unclear. (Dkt. No. 31, Ex. 17 at 2.) The dispute about these financial understandings is not material to the court's decision. It is undisputed that nearly all the expenses for creating the installation were eventually carried by the museum.

The details regarding the acquisition of particular items and their arrangement were usually handled pursuant to Büchel's instructions. Frequently, however, the absence of the artist from the site and the level of generality of his commands required the museum to act to some extent on its own, attempting to follow the artist's broad directives subject to his later approval, disapproval, or suggestions for

---

**3.** Maccarone is an employee of Maccarone Gallery, Inc., Büchel's "gallery sales representative" in the United States. The exact relationship between Büchel and Maccarone is unclear, although Büchel denies she is his agent in any legal sense.

modification. Büchel was personally present at the site for only a portion of the months-long installation process. (Dkt. No. 7, Answer and Countercls. of Christoph Büchel ¶ 14.) As 2006 drew on, what began to emerge as "Training Ground for Democracy" was, of necessity, the product of a highly collaborative process with a good deal of back-and-forth and shared decision-making.[4]

It is equally clear that, as the project evolved, the working relationship between Büchel and the museum was marked by a fair amount of conflict and delay. (*See,* *e.g.,* Dkt. No. 42, Ex. 9 at 2.) The previous exhibit occupying Building 5 was removed later than had been planned. A gate had to be built in the wall of the building to allow some of the larger objects for the installation to be brought inside. Additionally, it took longer than anticipated for Büchel to provide the museum with a detailed layout for the exhibit and its individual components. By late October, 2006, MASS MoCA began to express concern about the timing of the show.

The museum also questioned the adequacy of the directions it was receiving from Büchel, increasing the friction between the parties. An October 28 e-mail from Joseph Thompson to the artist reveals his frustration and his desire to accelerate progress on the exhibit; the communication hints at some anger on Büchel's side as well:

Though I think you think me an idiot for the way I tried to nudge work along over the past few weeks, believe me, we all just wanted to get as much done as humanly possible.... Frustrated that we couldn't get going, I was doubly frustrated that, after putting on [sic] to the mobile home, you pulled us from that too (having provided absolutely no useful direction to begin with, I would point out.)

(If you were pissed last week, let me assure you, my friend, I shared the feeling, since I thought our requests for advance direction were utterly within the realm of what anyone should be expected to provide for an undertaking of this scale and complex ... [sic] and those "prep moves" were all on the production schedule we discussed in some detail during your visit, and put down in writing shortly thereafter, so it wasn't as if we had changed the rules of the road.)

(Dkt. No. 31, Ex. 25 (first ellipsis added, second ellipsis in original).) The fluidity of the exact shape and content of the project were evidenced by Büchel's complaints about the museum's early release of information to the press based on the initial plans he provided, since, in his view, these might undergo changes before the installation opened. (Dkt. No. 31, Ex. 24.)

Büchel returned to MASS MoCA to work on the installation on October 29, 2006 and stayed through December 17, 2006. He apparently had some further trouble in working with the MASS MoCA

---

4. Defendant's answer purports to deny any collaboration. (Dkt. No. 7, Answer and Countercls. of Christoph Büchel ¶ 13.) However, immediately following this denial Büchel admits that the museum agreed to provide "funding, logistical and technical support and to provide the necessary components and objects for the Work of Art." (*Id.*) As this admission and the undisputed facts regarding the actual fabrication of "Training Ground for Democracy" confirm, the cre-

ation of the art installation was, in fact, "collaborative," as that term is understood in ordinary usage. Certainly from the museum's point of view there was never any doubt about this. (*See* Dkt. No. 31, Ex. 16, letter of MASS MoCA employee Nato Thompson to Defendant, dated September 14, 2006, stating "MASS MoCA and Christoph Büchel shall collaborate in the fabrication of a new work of art, tentatively called *Training Ground for Democracy* ....")

staff assisting him during this visit, complaining to Joseph Thompson and another MASS MoCA employee, Nato Thompson, that some of their actions in assembling portions of the installation were inconsistent with his directions. The ambiguity regarding the creative roles emerged clearly from Büchel's complaint about the head of the museum crew that "either he is the artist that does the show or I am. . . . Let him know . . . . that I am supposed to be the artist." (Dkt. No. 31, Ex. 36 at 2–3.) Arguments about alleged missteps by the crew led to more delays as Büchel determined that he had to correct them. (*See id.*)

Toward the end of this visit, the parties agreed that the installation would not be ready by the opening date of December 16, 2006. In several e-mails to museum personnel, Büchel blamed the delay on "several fuck ups within the museums [sic] logistic and curatorial management," refusing to continue working until MASS MoCA agreed to a postponement of the exhibit until March 2007. (Dkt. No. 31, Ex. 28; *see also* Dkt. No. 31, Ex. 29.) The museum agreed that a deferral of the opening date was necessary, and in collaboration with Büchel it formulated an announcement ascribing the delay to "logistical complexities encountered by the museum in preparing galleries for Christoph Büchel's vast installation." The news was posted on MASS MoCA's website on December 6, 2006.

Meanwhile, Büchel and MASS MoCA continued to disagree about how much to spend on the installation as well as the adequacy of MASS MoCA's attempts to acquire objects and set up the exhibit. Before the end of Büchel's visit, the cost of the installation had run far beyond the $160,000 budget that the museum had envisioned, and MASS MoCA was seeking more funds to allow completion of the work. (*See, e.g.*, Dkt. No. 31, Ex. 35.)

At first Büchel seemed ready to work with a new project manager assigned to him by the museum in the wake of these disagreements. (*See, e.g.*, Dkt. No. 31, Ex. 43.) However, the continuing snags in accommodating the costs of the exhibit and in putting it together to Büchel's satisfaction soon provoked renewed hostility. As of December 27, Büchel was telling MASS MoCA that:

> I don't now if this is really a great opportunity when you get an invitation to do a show, where you have to make constantly tons of compromises, where you have to fight constantly against stubbornness as well against the institution and work with people that think they know my art better than I do as well try to sabotage the project, where you are being put in the position of playing the bitch and not at all an artist, and where you have to cancel a huge solo show in paris because of all the fuck ups and delays. . . . I really don't need more shit spilled on me. . . . I will not come to continue the installation of the show until all financial problems are solved[.]

(Dkt. No. 42, Ex. 11 at 1 (spelling and grammar as in original).) Büchel repeated his concerns in a January 20, 2007 e-mail to Joseph Thompson in which he articulated his disappointment that MASS MoCA had "proved repeatedly not to be capable—neither logistically, schedule—nor budget-wise—to manage my project, nor did you understand what my work is about and how it has to be treated." (Dkt. No. 31, Ex. 45 at 2.) He stated that he would not return to finish "Training Ground for Democracy" unless certain conditions were met, including the raising of sufficient funds to complete the project (excluding any contributions from Büchel's galleries,

as Büchel would have to repay a portion of that money personally), the hiring of an independent crew to assist him, and no further negotiation regarding the scope of the installation. (*Id.* at 2–5.) Büchel refused to accept "any more pressure or compromises [on] how things have to be done," accusing MASS MoCA of "sabotage acts" and lack of respect and enumerating its alleged failures in procuring materials efficiently and economically. (*Id.* at 3–4.)

Though hoping to find a way to effectuate Büchel's return, Joseph Thompson apparently soon recognized that this conflict made that unlikely. He stated in a January 31 e-mail that "[t]here is some small chance his galleries may convince or compel him to return to North Adams ... but I think there is a high likelihood we will open the exhibition at it[s] current 85% level of completion." (Dkt. No. 31, Ex. 51 at 1.)

Despite that pessimism, Thompson attempted to negotiate Büchel's return in a February 2 response to his complaints. He promised an additional $100,000 of the museum's money to cover the completion costs. (Dkt. No. 31, Ex. 53 at 2–4.) He also mentioned that one of Büchel's galleries, Hauser and Wirth, had offered another $100,000, though he left the decision whether to accept that at Büchel's discretion, in light of his expressed wish not to obtain any more funds from his galleries. (*Id.* at 2.) Thompson stated that meanwhile his crew would continue working on the exhibit through February 11 before they would have to move on to other projects. (*Id.*)

At the same time, Thompson expressed his serious concern about the time, money, and effort that the museum had already expended on this project beyond its original budget. (*Id.* at 2–4.) He noted that these overruns were due not just to errors by MASS MoCA but also the "ex-

pansiveness, fluidity, and detail of [Büchel's] vision," which had entailed substantial evolution of the installation beyond the "relatively simple backlot streetscape ... [Büchel] first conceived," and that the museum had attempted to be supportive of that expansion in scope. (*Id.* at 3–4.)

Büchel rejected this overture, informing MASS MoCA that it had failed to fulfill the conditions he had set out as prerequisites for his return. (Dkt. No. 31, Ex. 55.) Still, the museum continued to solicit his input and to try to persuade him to finish the installation. (*See, e.g.,* Dkt. No. 31, Exs. 56, 57.) At the same time, MASS MoCA observed that Büchel would have to remain within certain budgetary constraints and that, while it may have made "small screw ups" in implementing instructions, Büchel himself was also responsible for some delays. (Dkt. No. 31, Ex. 57 at 1–5.)

Similar exchanges continued for the next few months, with a new note of personal nastiness. At one point, for example, Büchel told Thompson, "I think you should definitely apply as a volunteer in the white house. that's the best training ground for politicians, you would be very skilled." (Dkt. No. 31, Ex. 58 at 1 (punctuation as in original).) One of the MASS MoCA crew complained to other museum personnel that Büchel "has missed his opportunity to return, he has been his own worst enemy, he has screwed-up a once in a life time chance to work with a world class museum on such a major scale." (Dkt. No. 31, Ex. 60 at 1.) Another staff member stated that "[w]e're down and [Büchel is] still kicking us." (Dkt. No. 31, Ex. 59 at 1.) From Europe, Büchel prepared and issued a press release listing the problems he had encountered in trying to put the installation together, accusing MASS MoCA of "serious mismanagement," and censuring the museum for allowing people to walk

past the unfinished work. (*See* Dkt. No. 31, Exs. 62, 77.)

By late March, MASS MoCA's attempts to negotiate Büchel's return had become mixed with assertions that the artist's demands were "not a reasonable position, by any measure of reasonableness" and that if he did not complete the installation it would be disassembled at his expense or displayed to the public in its unfinished state. (Dkt. No. 31, Ex. 64 at 3–4.) In response, Büchel accused MASS MoCA of blackmail and of "hid[ing] all the true facts [and] tell[ing] untrue stories." (Dkt. No. 31, Ex. 67 at 2.) In April 2007, Büchel cut off communication with the museum.

Throughout this dialogue and up until May 2007, MASS MoCA continued work on the installation based on the instructions that they had from Büchel's e-mails and verbal directions during his visits, the last of which were received in January 2007. The evolving construction of the installation during this period was based on a "best reasonable guess" of what Büchel would have wanted, and internal e-mails show concern regarding how far MASS MoCA could go before "stepping over any lines of 'artistic integrity.'" (Dkt. No. 31, Ex. 60 at 1; *see also* Dkt. No. 31, Exs. 51, 59.) Joseph Thompson recommended that the museum go ahead with anything "known with 80% certainty," (Dkt. No. 31, Ex. 60 at 2), in the hope that "there is some chance we'll see him here again," (Dkt. No. 31, Ex. 59 at 2.), and that Büchel would be able to correct any missteps.

A few examples of some points of disagreement between Büchel and the museum staff will convey the tenor of their friction. Defendant complained that the corner of the house protruded through a cinder block wall, rather than having the wall cut through the house. Plaintiff countered that its staff had constructed the wall in accordance with the artist's instructions. Büchel asserted that the museum hung the bombs in the bomb carousel too low, since he intended them to be leaflet bombs to scatter propaganda, whereas the museum asserted that his instructions were to place the bombs at a height where children could ride on them, in a allusion to a scene late in the film *Dr. Strangelove.* According to Defendant, there were to be no actual projectors in the cinema, the police car was to be on its side rather than its bottom, the mobile home's stairs were in an unapproved style, the Muslim prayer rugs had the wrong orientation, and a sofa—not a chair—was called for in the sniper position. As to each of these points the museum argued that it had followed the artist's instructions, that adjustments could easily have been made, or that logistical constraints, such as the fire code, dictated their decisions.

On May 2 and May 5, 2007, Büchel's counsel contacted MASS MoCA to inform Thompson of the conditions that had to be satisfied before Büchel would return to the museum, and to confirm again that Büchel opposed any showing of the installation in its unfinished state. On May 21, MASS MoCA announced that it would be opening a new exhibit called "Made at MASS MoCA" in a small space at the end of Building 5. Since visitors to this exhibit would have to pass through Building 5, MASS MoCA put up tarpaulins to block views of the unfinished installation and signage directing visitors past the covered installation.

Also in May 2007, the museum halted work on "Training Ground for Democracy." By this time, it had expended some $300,000 on materials and labor for the exhibit. As noted, virtually all of the elements of the installation were purchased by MASS MoCA. On May 21, MASS MoCA filed a complaint seeking declarato-

ry judgment from this court that it could publicly display the unfinished work. As detailed above, Büchel's attorneys responded with a five-count counterclaim.

To give the reader some idea of the partially completed "Training Ground for Democracy," an overview of the court's observations during the September 18, 2007 view might be helpful.

First, the limited visual access afforded anyone walking past while the assemblage was under wraps provided *no* significant access to, or *any* reliable sense of, the partially completed installation. Any observer of the tarpaulins would receive a vague impression of variously sized lumps, with random bits occasionally protruding out or only partially covered, and a general sense of the overall size of the project—no more. No reasonable person would feel that he or she had seen the unfinished work itself, or any model or derivative work based upon it. Moreover, no reasonable person, looking at these bulges and protrusions, could fairly claim that he or she had viewed an artistic creation by Christoph Büchel.

Of course, the view once the tarpaulins were removed was quite different. The paths through the large number of objects provoked powerful and not altogether pleasant impressions. Features in this landscape included a run-down movie theater, a replica of the "spider hole" where Saddam Hussein was captured, a grim jail, a down-at-the-heels law office, a propaganda van, a tacky mobile church, a voting area, a bank, a looted convenience store, a blown-up police car (the words "Pride, Professionalism and Partnership" still visible on its side), an oil tanker, a beat-up van, an eerie full-size Cape-style house, a watchtower, a torture area, a messy school

room with the remnants of an interrupted lesson on the Second Amendment's right to bear arms, a shooting gallery, piles of transparent garbage bags full of empty pill containers, a sniper position, a children's carousel featuring large black bombs, and much more. A fair amount of climbing and stooping was necessary to move through, over, and among the objects. To the extent that the assembly of objects was an attempt to say anything about democracy, an impression of decay, hypocrisy, and despair, either now or in the near future, was unavoidable.

A striking aspect of the work—at least as it could be perceived in its partial state—seemed to be its invitation to step, so to speak, through the picture frame and encounter the artwork as a three-dimensional world. Its huge size and extraordinary level of detail necessarily made it difficult to perceive as the product entirely of one person's imagination and execution. The record is not clear, for example, as to whether the police car's boast of "Pride, Professionalism and Partnership" (which had a particularly ironic sting in the empty, defeated atmosphere) was exactly specified by the artist, or was the product of happenstance, or even the fruit of a lucky impulse by the staff member who located and acquired the wreck (presumably not Büchel). In another case, a crumpled Mars candy bar wrapper lay on the floor. Again, the record is not clear whether the artist chose that particular wrapper, with its planetary and/or mythological implications, or whether a Snickers wrapper, with a different ironic spin, might just as easily have been selected by the fabricator who tossed it in its place.[5] In a work where the general concept came from the origi-

---

5. Of course the wrapper might also have been tossed inadvertently, a possibility that en-

riched the ironic counterpoint.

nating artist's imagination, but where so many of the details of fabrication and execution relied on chance or the discretion of the workers on the scene, an ocean away from the artist, the final product had a blended flavor, which may or may not have been part of the point.

Whether this spirit of amalgamation was an intended element of the aborted art, or the compelled product of exigencies inherent in this long-distance project, the unfinished, amorphous result presented a particularly awkward fit with the squared corners of the law, as will be seen now.

## III. STATUTORY FRAMEWORK

### A. The Visual Artists Rights Act.

The Visual Artists Rights Act ("VARA"), 17 U.S.C. § 106A, was passed in 1990 as an amendment to the Copyright Act in order to implement the provisions of Article 6bis of the Berne Convention, an international agreement first adopted in Switzerland in 1886 at the instigation of the French author Victor Hugo. Phillips v. Pembroke Real Estate, 459 F.3d 128, 133 & n. 3 (1st Cir.2006). Part of the intent of the Convention, incorporated into VARA, is to protect certain "moral rights" of artists in the works of art they create. Id. at 133 (citing Carter v. Helmsley–Spear, Inc., 71 F.3d 77, 81, 83 (2d Cir.1995)). These moral rights supplement the more purely economic protections of the Copyright Act.

The statute defines "a work of visual art" as "a painting, drawing, print, or sculpture, existing in a single copy." 17 U.S.C. § 101. If an artwork fits within that category, it is subject to VARA. Exclusions from the definition include advertising, motion picture or other audio-visual works, and technical drawings and diagrams. Although none of these apply directly here, the implication of these exceptions has some significance for this case.

The statute's legislative history suggests that the decision not to include film within VARA's protections stemmed in part from the fact that the creation of this form of art tends to be "a collaborative effort," with the possibility of evolving formats in different markets. H.R.Rep. No. 101–514, at 9.

Even without an explicitly identified exception, in the leading case in this circuit the court of appeals showed little hesitation about grafting another exception to the statutory protections. In the Phillips case, the First Circuit placed one well-established form of creativity, "site-specific" art, outside the protection of VARA when its application collided with other well-recognized legal interests. See Phillips v. Pembroke Real Estate, 459 F.3d 128, 141–43 (1st Cir.2006).

Section 106A makes concrete the somewhat rhetorical concept of "moral rights" by specifying two rights within VARA protection: the rights of attribution and integrity. The right of attribution preserves the right of the author of an artwork "to claim authorship of that work . . . [and] to prevent the use of his or her name as the author of any work of visual art which he or she did not create." 17 U.S.C. § 106A(a)(1). Thus, an artist's attributive rights would prevent Artist B from claiming Artist A's work as his or her own. The same protection would prevent Artist B from creating a work, but labeling it as Artist A's.

The right of integrity allows the author to "prevent the use of his or her name as the author of [a work of art] in the event of a distortion, mutilation, or other modification of the work which would be prejudicial to his honor or reputation" and "to prevent any intentional distortion, mutilation, or other modification which would be prejudicial to his or her honor or reputation." Id. § 106A(a)(3). This aspect of VARA pro-

tection would prevent a third party from taking Artist A's finished sculpture, for example, and chopping pieces off it, or painting it blue, and then exhibiting it as A's work.

Apart from instances clearly within the statute's reach, it is fair to say that neither Congress nor the courts have embraced VARA's limited adoption of the Berne Convention with enthusiasm. In fact, Congress signed onto the notion of an artist's moral rights hesitantly and passed VARA only after much debate. *Carter v. Helmsley–Spear*, 71 F.3d 77, 82 (2d Cir. 1995). The Supreme Court has observed that "Section 106A is analogous to Article 6*bis* of the Berne Convention . . . but its coverage is more limited." *Quality King Distribs. v. L'anza Research Int'l*, 523 U.S. 135, 149 n. 21, 118 S.Ct. 1125, 140 L.Ed.2d 254 (1998) (citations omitted). The House committee report on the bill noted "a consensus that the bill's scope should be limited to certain carefully defined types of works and artists" and that courts should use "common sense and generally accepted standards of the artistic community" in determining whether a work qualified for protection. H.R.Rep. No. 101–514, at 11, 13. In making this determination "the author ordinarily has the burden of showing that the particular work falls within the definition set forth in the bill." *Id.* at 13.

Significantly, while recognizing rights of attribution and integrity, Congress declined to include in VARA protection for the right most closely tied to the preliminary stages of an artist's work, the "right of divulgation" or "right of disclosure." This right gives the author of a work "complete discretion to determine if and when his work is ready to be displayed to the public." Henry Hansmann & Marina Santilli, *Authors' and Artists' Moral Rights: A Comparative Legal and Eco-*

*nomic Analysis*, 26 J. Legal Stud. 95, 136 (1997). Unlike the United States, several countries, including France, Germany, and Italy, apparently recognize this right. Cyrill P. Rigamonti, Deconstructing Moral Rights, 47 Harv. Int'l L.J. 353, 359 (2006).

Beyond the repeated insistence by Congress on the narrow scope of VARA, there is good reason to suspect that *unfinished* works of art may have only limited protection. Certainly VARA itself makes no mention of unfinished work, and, as the First Circuit has stated, the argument "that VARA's silence on a subject is actually evidence that the statute addresses that subject . . . is an odd way to read a statute." *Phillips v. Pembroke Real Estate, Inc.*, 459 F.3d 128, 142 (1st Cir.2006); *see also id.* at 143 n. 12 (finding that though legislative history of VARA is conflicted, the "inescapable fact [that] . . . the concept of site-specific art is never mentioned by name . . . only confirms our sense of VARA's plain meaning").

The absence of any mention of unfinished works in VARA suggests that courts should use caution in the "common sense" analysis of the statute's scope. Apart from the absence of any direct reference, the legislative history hints that Congress did not intend VARA to apply to unfinished works of art. Commentary refers to works that artists "have created" without ever mentioning works in progress. *See, e.g.*, H.R.Rep. No. 101–514, at 14.

The closest any decision has come to recognizing an unfinished work as protected art is *Flack v. Friends of Queen Catherine, Inc.*, 139 F.Supp.2d 526 (S.D.N.Y. 2001), holding that a clay sculpture intended to be used to create a mold for a subsequent bronze work was itself an independent work of art protected by VARA. *Id.* at 533–34. However, in that case the protection extended only to the *completed* clay model. Significantly, that court found

*no* VARA protection for the artist's partially cast bronze statute, stating that "VARA most decidedly does not cover works that do not yet exist." *Id.* at 535.

Despite these concerns it is not hard to hypothesize clear violations of, for example, an artist's protected right of attribution, even in the case of an unfinished work. Thus, if Artist B purloined Artist A's unfinished painting or sculpture, placed his own name on it, and attempted to pass the work off as his own finished, or even unfinished, creation, it seems likely that courts would have little trouble finding a VARA violation.

Büchel's attorneys point to the definitional sections of the Copyright Act as suggesting that VARA may extend to unfinished work, so long as it has been "created," by being fixed in a tangible medium of expression for more than a transitory duration. *See* 17 U.S.C. § 101 (defining "created" and "fixed"). However, as noted, where a plain reading of VARA extends the statute beyond the intent of its drafters and impinges adjoining practical considerations, the First Circuit has not hesitated to draw a line. *See Phillips v. Pembroke Real Estate, Inc.,* 459 F.3d 128, 142 (1st Cir.2006).

Moreover, the broad scope of the Copyright Act definitions may be of limited assistance as the court applies a "common sense" analysis of whether a particular unfinished work may be covered by VARA. One of the co-sponsors of VARA observed that "we have gone to extreme lengths to very narrowly define the works of art that will be covered.... The definition is not synonymous with any other definition in the Copyright Act...." H.R.Rep. No. 101–514, at 11. In *Lilley v. Stout,* 384 F.Supp.2d 83 (D.D.C.2005), the district judge noted that "VARA established a new and distinct genus of art: 'works of visual art,' which differs in many respects from the pre-existing categories in Section 102(a) of the Copyright Act." *Id.* at 86 (holding that a set of photographs taken to be used as studies for a painting did not qualify for VARA protection).

While this overview leaves much that is uncertain, some details about the proper application of VARA do emerge clearly.

■ First, as a broad matter, courts should be wary of attempts to invoke VARA where a violation of the explicitly recognized rights of attribution or integrity is difficult to discern. Expansive application of VARA's embodiment of "moral rights" was not contemplated by Congress and generally has not been countenanced by the courts.

■ Second, unfinished art may not be covered by VARA at all. To the extent that an artist seeks protection for an uncompleted work, a violation of one of VARA's two explicitly recognized rights must be demonstrated with special clarity.

■ Third, even where a piece of work falls technically within the statute's definition, and even where a violation of the right of attribution or integrity has been shown, a violation of VARA might nevertheless not be found, where (as in *Phillips*) conflicting legal interests, practical considerations, or common sense demand otherwise.

Fourth, the statute's exclusion of coverage for film suggests that as a work becomes more collaborative and fluid the protections offered by VARA will perhaps diminish.

### B. *The Copyright Act.*

The Copyright Act is the long-established statutory instrument used to protect intellectual property rights. Among other prerogatives, it grants a copyright owner the exclusive right both to display the

copyrighted work publicly and to create derivative works from the original creation. 17 U.S.C. § 106(2), (5). Where a work is created jointly, it is possible for the ownership of the copyright to be joint as well under 17 U.S.C. § 201.

A number of exceptions lie outside these statutory protections. The owner of a particular physical copy of a copyrighted work may display that copy, as long as it was lawfully made, "either directly or by the projection of no more than one image at a time, to viewers present at the place where the copy is located." 17 U.S.C. § 109(c). Thus, a museum that has purchased a painting may display that painting without getting permission from the copyright holder, even though it would not be able to sell posters displaying the image of the painting without violating copyright law.

██ As for the prohibition against the unlicensed creation of derivative works, that restriction is limited by the Copyright Act definition of a "derivative work":

> [A] work based upon one or more preexisting works, such as a translation, musical arrangement, dramatization, fictionalization, motion picture version, sound recording, art reproduction, abridgment, condensation, or any other form in which a work may be recast, transformed, or adapted. A work consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship, is a "derivative work".

17 U.S.C. § 101. To violate an artist's exclusive right to make derivative works from his original piece of art, the violator's work must itself be an "original work of authorship." *Lee v. A.R.T. Co.*, 125 F.3d 580, 582 (7th Cir.1997). "Original" is not defined in the Copyright Act, but the Su-

preme Court has stated that "as the term is used in copyright, [it] means only that the work was independently created by the author ... and that it possesses at least some minimal degree of creativity." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 345, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991). In other words, in order for a party to violate the Copyright Act by appropriating another artist's right to create derivative works, the violating artist must, himself or herself, create an original, derivative work of art.

## IV. DISCUSSION

### A. Plaintiff's Claim for Declaratory Relief.

Based upon the undisputed facts and upon the law set forth above, lengthy discussion is not necessary in order to confirm that nothing within VARA or the broader provisions of the Copyright Act forbade the museum's exhibition of the assembled materials in Building 5.

As a threshold matter, it is doubtful that VARA even covered the assembled materials that constituted this unfinished installation. If VARA does not cover an unfinished work of art, the discussion stops.

██ Assuming the statute does apply, display of this unfinished installation would have violated neither Büchel's right of attribution nor his right of integrity. Regarding the right of attribution, the museum, had it gone forward with its plan to display the partially completed project, expressed no intent to present the work as its own artistic creation, or, for that matter, as Büchel's. Defendant's name would have been formally associated with the project only to the extent that he chose, if at all.[6] This was simply not a case of

---

6. Defendant's counsel's suggestion that the publicity surrounding the project meant that

some members of the public might associate the project with **Büchel**, and that this risk

MASS MoCA planning to present Büchel's art work as its own, or presenting its own or someone else's art work as Büchel's.

■ Just as there was no risk of any violation of a right of attribution, nothing in MASS MoCA's planned display of the unfinished installation would have violated Büchel's right of integrity, for the simple reason that no completed work of art ever existed on these facts for the museum to distort, mutilate or modify. To suggest that the display of an unfinished and abandoned work somehow constitutes a distortion, mutilation, or modification of that non-existent work is simply inconsistent with the ordinary usage of those terms. Moreover, as has already been noted repeatedly, the museum had no intention of labeling the unfinished installation as Büchel's.

The artist's personal frustration at the situation—indeed, the frustration of both parties—may evoke some sympathy. Defendant appears to have been sincerely unhappy that Mass MoCA intended to exhibit without his permission something that he had worked on. But the question before the court is not whether the artist (or the museum) would have been justified in feeling peeved, but whether Büchel would have suffered a violation of his rights under VARA if the museum had gone forward with its plan. Since he would have suffered a violation of no right recognized by this statute, this messy situation simply fell outside the outside the boundary of VARA and, *a fortiori*, outside

the more general provisions of the Copyright Act.[7]

### B.  *Count I of the Counterclaim.*

■ In the first count of his counterclaim, Defendant sought (1) a declaratory judgment that any future display of the unfinished installation would violate VARA and (2) a permanent injunction barring any such display. Final judgment will enter for Plaintiff on both aspects of this count, on two grounds. First, for the reasons stated, Defendant is incorrect as to the reach of VARA and is therefore entitled to no declaration in his favor. Second, the claim for injunctive relief is moot. The unfinished installation was never displayed and now, unfortunately, is no more.

### C.  *Count II of the Counterclaim.*

■ In this count, Defendant sought monetary damages based on VARA arising from work done on the installation without his approval, and from the museum's decision to allow patrons to walk past the unfinished installation while it was covered by tarpaulins. At the risk of repetition, the court must observe again the difficulty on these facts in concluding that there was any work of art protected by VARA here in the first place. Certainly the efforts made by museum staff to implement Büchel's long-distance instructions, even if occasionally misguided, cannot form a basis for VARA liability. Fumbled efforts to assist in creating, or failing to create, a work of art are not equivalent to distor-

---

afforded him special rights, has no grounding in VARA's provisions. Moreover, if the *perception* of the artist's involvement in a project were enough, by itself and without any explicit attribution by the exhibitor, to trigger VARA protection, the potential reach of the statute would be so unpredictable that it would exceed Congress' proviso that this law be applied with restraint.

7. Though perhaps somewhat tangential, it is worth noting a painful irony in this case, which is that one critical purpose of VARA is to *preserve* art. As the House Report stated, "the integrity right helps preserve artworks intact for all of us to enjoy." H.R.Rep. No. 101–514, at 14. Here Defendant's goal, from the outset, has been the destruction of the incomplete installation.

tion, modification, or mutilation of the art. Moreover, in any event, an installation covered so as not to be visible can hardly be described as having been "exhibited," while distorted or otherwise. Finally, a legal rule to the effect that when a museum allows an unfinished, covered assembly of materials to be seen, it has violated VARA, would create at least an awkward, and probably an unmanageable, burden for both artists and exhibitors.

## D. *Count III of the Counterclaim.*

In this count Defendant seeks damages under the broader provisions of the Copyright Act based on Plaintiff's decision to allow members of the public to walk past the covered exhibit. For the reasons already stated, Plaintiff is entitled to judgment on this count.

## E. *Counts IV and V of the Counterclaim.*

 In these counts Defendant seeks damages under the provisions of the Copyright Act that protect an artist's right to create "derivative" works based upon a copyrighted original work, or upon that work's model or plans. Even assuming that the stumbling, and eventually abandoned, process of collaboration during 2006 produced an original work of art subject to copyright protection, which is highly doubtful, clearly no "derivative" work of art was created by MASS MoCA's attempt (however flawed) to play its part in this process. Moreover, the argument that the museum, by placing tarpaulins on the unfinished piece to conceal it from view, thereby created an independent, original work of art that was derivative of what was under the coverings would extend the notion of "derivative" art beyond anything contemplated by copyright law. This statutory shoe simply will not fit the undisputed facts.

## V. *CONCLUSION*

For the foregoing reasons, the motion for summary judgment of Plaintiff MASS MoCA (Dkt. No. 28) is hereby ALLOWED, and the motion for summary judgment of Defendant Büchel (Dkt. No. 32) is hereby DENIED. The clerk is ordered to enter judgment for Plaintiff MASS MoCA on its complaint for declaratory relief and for Plaintiff MASS MoCA on all five counts of Defendant's counterclaim. This case may now be closed.

It is So Ordered.