# United States Court of Appeals
## For the First Circuit

No. 08-2199

MASSACHUSETTS MUSEUM OF CONTEMPORARY ART FOUNDATION, INC.,

Plaintiff, Appellee,

v.

CHRISTOPH BÜCHEL,

Defendant, Appellant.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Michael A. Ponsor, U.S. District Judge]

Before

Lipez and Howard, Circuit Judges,
and Woodcock, District Judge.*

George T. Conway III, with whom Elaine P. Golin, Wachtell, Lipton, Rosen & Katz, John C. Blessington, Sara E. Yevics, K&L Gates LLP, Elena M. Paul, Sergio Muñoz Sarmiento, and Volunteer Lawyers for the Arts were on brief, for appellant.
John L. Gardiner, with whom Elizabeth A. Hellmann, Kurt Wm. Hmr, Lindsay R. Dickerson, and Skadden, Arps, Slate, Meagher & Flom LLP were on brief, for appellee.

January 27, 2010

*Of the District of Maine, sitting by designation.

**LIPEZ**, **Circuit Judge**.  As one observer has noted, this case, which raises important and unsettled legal issues under the Visual Artists Rights Act ("VARA"), may well serve as "the ultimate how-not-to guide in the complicated world of installation art." Geoff Edgers, Dismantled, The Boston Globe, Oct. 21, 2007, at 1N. Artist Christoph Büchel conceived of an ambitious, football-field-sized art installation entitled "Training Ground for Democracy," which was to be exhibited at the Massachusetts Museum of Contemporary Art ("MASS MoCA," or "the Museum").  Unfortunately, the parties never memorialized the terms of their relationship or their understanding of the intellectual property issues involved in the installation in a written agreement.  Even more unfortunately, the project was never completed.  Numerous conflicts and a steadily deteriorating relationship between the artist and the Museum prevented the completion of "Training Ground for Democracy" in its final form.

In the wake of this failed endeavor, the Museum went to federal court seeking a declaration that it was "entitled to present to the public the materials and partial constructions" it had collected for "Training Ground for Democracy."  Büchel responded with several counterclaims under VARA and the Copyright Act,[1] seeking an injunction that would prevent MASS MoCA from

---

[1] VARA was enacted as an amendment to the Copyright Act.  See infra Section II.

-2-

displaying the unfinished installation and damages for the Museum's alleged violations of his rights under both VARA and the general Copyright Act.

On cross-motions for summary judgment, the district court assumed that VARA applies to unfinished works of art, but it nonetheless ruled for the Museum in all respects because, even granting VARA's applicability, it found no genuine issues of material fact. Massachusetts Museum of Contemporary Art Found., Inc. v. Büchel, 565 F. Supp. 2d 245 (D. Mass. 2008). Büchel appeals. Because we find that, if VARA applies, genuine issues of material fact would foreclose summary judgment on one of Büchel's VARA claims – that MASS MoCA violated his right of artistic integrity by modifying the installation – we cannot assume that VARA applies to unfinished works but instead must decide its applicability. We conclude that the statute does apply to such works.

We further conclude that, in addition to his VARA claim, Büchel asserts a viable claim under the Copyright Act that MASS MoCA violated his exclusive right to display his work publicly. Accordingly, we reverse in part the grant of summary judgment for MASS MoCA and remand for further proceedings.

**I.**

**A. The Parties**

MASS MoCA opened in 1999 as a center for the creation and display of contemporary art. The Museum "seeks to catalyze and support the creation of new art, expose [its] visitors to bold visual and performing art in all stages of production, and re-invigorate the life of a region in socioeconomic need." Massachusetts Museum of Contemporary Art, Mission Statement, http://www.massmoca.org/mission.php (last visited Jan. 13, 2010). In its expansive facility in North Adams, Massachusetts, the Museum strives to "make the whole cloth of art making, presentation and public participation a seamless continuum." Id. Over the last decade, the Museum has hosted the production and presentation of over sixty exhibits of visual art, including over 600 works of art by more than 250 individual artists. Some of these works have been displayed in Building 5, the Museum's signature exhibition space, which spans the length of a football field. The Museum strives to "offer visual artists the tools and time to create works of a scale and duration impossible to realize in the time and space-cramped conditions of most museums," and MASS MoCA prides itself on exposing its audiences to "all stages of art production: rehearsals, sculptural fabrication, and developmental workshops are frequently on view, as are finished works of art." Id.

Christoph Büchel is a Swiss visual artist who lives and works in Basel, Switzerland. He is "known for building elaborate, politically provocative environments for viewers to wander, and sometimes to crawl, through." Randy Kennedy, The Show Will Go On, but the Art Will Be Shielded, N.Y. Times, May 22, 2007, at E1 ("The Show Will Go On"). One critic has stated that "Mr. Büchel's environments are huge in scale," "like bristling three-dimensional history paintings," yet are "so obsessively detailed that they might best be described as panoramic collage." Roberta Smith, Is It Art Yet? And Who Decides?, N.Y. Times, Sept. 16, 2007, at 21.

B. Factual Background

Focusing first on those facts that are undisputed, we sketch the course of dealings between Büchel and MASS MoCA to put this appeal in context.[2] MASS MoCA became interested in planning a new installation with Büchel. The artist visited the North Adams facility in October 2005 to begin preliminary discussions regarding the project, and those discussions continued into 2006. At some point during this time, Büchel proposed, and the Museum agreed to, a project entitled "Training Ground for Democracy." As Museum Director Joseph Thompson indicated in a letter to Büchel's gallery representatives, MASS MoCA understood that "Büchel's projects typically require a lengthy period of installation and

_____

[2] We consider the parties' conflicting accounts of the key evidence in our summary judgment analysis, infra.

-5-

preparation," and that, given the gallery space of Building 5, "this project [would] be his largest venture to date."

Büchel conceived of the exhibit as "essentially a village, . . . contain[ing] several major architectural and structural elements integrated into a whole, through which a visitor could walk (and climb)." According to an affidavit submitted to the district court, Büchel envisioned the work in the following way:

> It was to adopt the role-play of U.S. military training for its visitors, who would be given the opportunity to "virtually" change their own various identities in relation to the collective project called "democracy": training to be an immigrant, training to vote, protest, and revolt, training to loot, training iconoclasm, training to join a political rally, training to be the objects of propaganda, training to be interrogated and detained and to be tried or to judge, training to reconstruct a disaster, training to be in conditions of suspended law, and training various other social and political behavior.

In August 2006, Büchel spent ten days in residence at MASS MoCA. During this time, he and a partner prepared a basic schematic model of the proposed installation. MASS MoCA agreed to acquire, at Büchel's direction but its own expense, the materials and items necessary for the project.

Unfortunately, the parties never formalized the contours of their relationship or firmly established the project's financial scope and precise specifications by executing any written instrument. Although MASS MoCA's curator, Nato Thompson (no

relation to the Museum Director),[3] sent Büchel's gallery sales representative in the United States a letter on September 14, 2006 that was designed to "formalize [the parties'] relationship on this project," there is no indication that Büchel himself ever saw, much less signed, this proposal.[4] The gallery responded with a proposed contract of its own, providing that MASS MoCA should bear the costs of transporting and organizing the various materials for the installation. The Museum did not respond to this proposal. Additionally, it is undisputed that Büchel never signed a document waiving any rights to which he would otherwise be entitled under VARA. The parties did apparently agree, however, that once the planned installation was finished, and after the public exhibition period had concluded, MASS MoCA would not contest Büchel's sole title to any copyright in the completed work. The parties set an opening date of December 16, 2006 for the exhibit.

---

[3] Throughout the opinion, any reference to "Thompson" without a first name will refer to Museum Director Joseph Thompson. Nato Thompson will be identified by his full name.

[4] The letter, signed by Museum Director Joseph Thompson, was attached to an email sent by Nato Thompson. The proposal did not lay out a definitive budget for the project, although in a separate letter to Büchel the following day, Joseph Thompson stated "we think we've got a $160,000 project on our hands in direct costs." In a reply email dated September 24, 2006, Büchel did not explicitly agree to or reject the $160,000 figure, but suggested that MASS MoCA get in touch with his two galleries, which might provide information regarding "potential sponsors like foundations" for the installation.

Over the course of the fall, tensions began to develop between the artist and MASS MoCA employees, particularly Joseph Thompson. "In summary, the museum felt the artist's directions were vague, and his financial and logistical demands were increasingly unreasonable; the artist felt the museum was compromising his artistic integrity and failing to follow his instructions." MASS MoCA, 565 F. Supp. 2d at 247. One frequent source of conflict between the parties was the budget, with the Museum understandably concerned about keeping its costs for the massive project under control, and Büchel understandably insistent that his vision for "Training Ground" be fully realized. But as the district court correctly noted, "[t]he dispute about these financial understandings is not material" to whether Büchel has presented triable claims under either VARA or the Copyright Act, id. at 250, and we therefore need not focus on its messy details.

Instead, for our purposes, the key conflict between MASS MoCA and the artist involved Büchel's dissatisfaction with the way in which the Museum was implementing his instructions and procuring the items necessary for the installation. Büchel himself was not present in North Adams for the first several months of work on the project. Instead, he conducted much of his work on the installation throughout the fall of 2006 remotely, by providing Museum personnel with detailed instructions as to the particular

materials he required and their placement within the exhibition space.

In the words of the district court, "[a]t various points in the development of the installation, Büchel proposed several major components," some but not all of which later became part of the installation "as its elements evolved through discussions with MASS MoCA during the construction process." Id. These major components included a movie theater, a house, a bar, a mobile home, various sea containers, a bomb carousel, and an aircraft fuselage. Id. The Museum had begun seeking out some of these materials and others for potential use in the installation as soon as Büchel left North Adams at the end of August 2006, and continued to do so throughout the fall. One of the Museum's curators described the search for these items (at Büchel's direction) as "the ultimate scavenger hunt." However, problems soon arose, especially between Thompson and Büchel, as to the progress of the project, particularly when, as Thompson explained in an internal Museum email dated October 28, 2006, he had tried to "move the project along" by "making a few decisions in [Büchel's] stead." Thompson noted that Büchel, whom he described as having "clear vision" and "rock solid integrity," had taken "extreme, mortal[] offense" to Thompson's efforts.

On October 29, 2006, Büchel returned to North Adams to complete "Training Ground for Democracy," and three of his

assistants from Switzerland arrived shortly thereafter. Unhappy with some of the work that had been done by the Museum in his absence, Büchel felt that certain logistical and organizational failures by the Museum had endangered the timely opening of the show. Büchel wrote in an email to Thompson that he would not allow the Museum to open an "unfinished show in my name, since you are responsible for this major delay." By early December 2006, Büchel insisted that the Museum postpone the opening of the show and asserted that he would not "accept an opening of a work in progress or other compromise." During the first week of the month, MASS MoCA agreed to delay the opening, posting the following message on its website: "Due to logistical complexities encountered by the museum in preparing galleries for Christoph Büchel's vast installation, the exhibition's official opening date . . . will be re-scheduled."

Büchel remained onsite at the Museum working on "Training Ground" until December 17, 2006, when he left for the holidays. In Büchel's estimation, "Training Ground" was then only about 40% complete. At the time, he planned to return on January 8, 2007, in order to finish the work in time for a March 3 opening. When he left North Adams, the artist was obviously disappointed with the progress of "Training Ground." He called the Museum disorganized and faulted it for underestimating the scope of his project. He felt that Museum employees, by failing to precisely carry out his

detailed instructions and making artistic decisions in his stead, had generated even more work for his crew, as numerous components of the installation had to be reworked to Büchel's specifications. In general, he felt that the Museum was trying to scale back his artistic vision without consulting him.

Meanwhile, the Museum was running out of money for the project. In an attempt to secure further funding, it disregarded Büchel's express wishes and, in late December 2006, asked for money from his galleries. Angry and frustrated, the artist wrote that he would not move forward with the installation until "all financial problems are solved, regarding ALL elements of the show and until my crew is being sure that they [are] getting paid." By mid-January 2007, tensions had escalated to the point where Büchel informed the Museum that he would not return to continue work on "Training Ground" unless certain conditions, both financial and artistic, were met.

In Büchel's absence, MASS MoCA staff continued to work on the installation. The parties disagree as to whether the employees were merely executing instructions left by the artist or whether their actions represented independent artistic judgment, exercised in direct contravention of Büchel's express wishes. The parties also disagree as to whether, in the spring of 2007, while negotiations had stalled but work on the installation was ongoing, the Museum promoted - and even showed - the unfinished work to

-11-

numerous visitors without Büchel's consent, in one form or another.

As the vitriolic exchanges between the parties continued, and negotiations over the project's eventual completion became hopeless, "Training Ground" languished in its unfinished state. It became clear that Büchel would not complete the installation. On May 22, 2007, MASS MoCA announced the cancellation of "Training Ground," and contemporaneously publicized the opening of a new exhibit entitled "Made at MASS MoCA," which was to be "a documentary project exploring the issues raised in the course of complex collaborative projects between artists and institutions." Massachusetts Museum of Contemporary Art, Press Release, Presentation of Training Ground for Democracy Cancelled; New Exhibition, Made at MASS MoCA, to Open on Saturday, May 26 ("Press R e l e a s e "), a v a i l a b l e a t http://www.massmoca.org/event_details.php?id=144 (May 22, 2007). The press release noted that this lawsuit had been filed the previous day; it also highlighted the Museum's desire to use its "other experiences working with artists" to "provide [its] audience with thought-provoking insights into the complexities of the art-making process." Id. The release further explained that, due to "space constraints imposed by the materials assembled for Training Ground for Democracy," the exhibition would be presented in the Museum's "only remaining available gallery space"; therefore, in order to enter the exhibit, visitors would have to pass through

Building 5, "housing the materials and unfinished fabrications that were to have comprised elements of Training Ground for Democracy." Id. The Museum represented that "[r]easonable steps [had] been taken to control and restrict the view of these materials, pending a court ruling."

When "Made at MASS MoCA" opened, many in the art world disagreed with the Museum's handling of its dispute with Büchel, though the parties have different views on whether the Museum's actions ultimately tarnished the artist's reputation. Moreover, the parties differ on whether the "reasonable steps . . . taken to control and restrict the view of the[] materials" – the placement of yellow tarpaulins over the unfinished work – actually concealed all of the individual components and vital design elements of "Training Ground," or whether the tarpaulins simply "hid[] an elephant behind a napkin," effectively inviting individuals to peek behind the cloth coverings and view the unfinished work. See Charles Giuliano, Christoph Buchel's Tarp Art at Mass MoCA: Crap Under Wrap (July 31, 2007) ("Crap Under Wrap"), available at http://www.berkshirefinearts.com/show_article.php?article_id=368&category=finearts.

## C. Procedural Background

The Museum sued Büchel on May 21, 2007, in the United States District Court for the District of Massachusetts. The complaint asserted a single claim for declaratory relief under

-13-

VARA. The Museum sought a declaration that it was "entitled to present to the public the materials and partial constructions assembled in connection with an exhibit planned with the Swiss artist Büchel." Büchel responded by asserting five counterclaims against the Museum. The first sought a declaratory judgment and an injunction under VARA prohibiting the Museum from publicly displaying "the unfinished Work of Art or any of its component elements." The second sought damages for MASS MoCA's alleged violations of Büchel's VARA rights by "intentionally distort[ing] and modif[ying] the Work of Art" and allowing members of the public to "see and pass through" the unfinished work, both with and without the yellow tarpaulins. The third, fourth and fifth counterclaims sought damages and injunctive relief under the Copyright Act based on alleged violations of Büchel's right to publicly display and create derivative works from his work.

On MASS MoCA's motion, the court ordered an expedited discovery schedule that included a private viewing by the district court of Building 5 and the unfinished installation. After the close of discovery, both sides filed cross-motions seeking summary judgment on the complaint and all counterclaims. On September 21, 2007, the court held oral argument on the cross-motions and ruled from the bench. That decision addressed only the Museum's original complaint seeking declaratory relief to allow public display of the partially completed project and Büchel's corresponding counterclaim

-14-

seeking to prevent the Museum from showing the then-existing work. The court ruled in favor of the Museum, noting that nothing in VARA prevented MASS MoCA from showing the incomplete project. Therefore, MASS MoCA was "entitled to present" the unfinished installation to the public as long as it posted a disclaimer that would "inform anyone viewing the exhibit that the materials assembled in Building 5 constitute an unfinished project that [did] not carry out the installation's original intent." The court correspondingly denied the artist's request for injunctive relief barring public display of the unfinished installation, ruling that he had failed to prove a likelihood of success on the merits of his VARA claim. The court stated that it would "in the coming weeks" issue a detailed memorandum explaining its oral rulings and addressing the remaining claims.

However, several days after obtaining the ruling in its favor, MASS MoCA changed course. The Museum posted an announcement on its website stating that it had "begun removing materials gathered for Training Ground for Democracy and [would] not permit the public to enter the planned installation." MASS MoCA Blog, "We'll Remove Training Ground," http://blog.massmoca.org/2007/09/28/well-remove-training-ground/ (Sept. 28, 2007) (last visited Jan. 13, 2010).

On July 11, 2008, the district court issued its written opinion, recognizing that some of the issues presented in the case

were now moot, but nevertheless wishing to explain its holding and to address the VARA and Copyright Act claims remaining in the case. The court summarized its holding this way:

> When an artist makes a decision to begin work on a piece of art and handles the process of creation long-distance via e-mail, using someone else's property, someone else's materials, someone else's money, someone else's staff, and, to a significant extent, someone else's suggestions regarding the details of fabrication – with no enforceable written or oral contract defining the parties' relationship – and that artist becomes unhappy part-way through the project and abandons it, then nothing in the Visual Artists Rights Act or elsewhere in the Copyright Act gives that artist the right to dictate what that "someone else" does with what he has left behind, so long as the remnant is not explicitly labeled as the artist's work. No right of artistic "attribution" or "integrity," as those terms are conceived by VARA, is implicated, let alone violated in these circumstances. Similarly, the Copyright Act provides no mechanism for relief, legal or equitable, to an artist such as Defendant Büchel here, based on the decision of an exhibitor such as Plaintiff MASS MoCA to allow patrons to walk past covered components of an unfinished installation.

565 F. Supp. 2d at 248-29. The court therefore granted MASS MoCA's motion for summary judgment and denied Büchel's, entering judgment for the Museum on its claim for declaratory relief as well as on all five of Büchel's counterclaims. Büchel appeals.

## II.

Passed in 1990, the Visual Artists Rights Act, 17 U.S.C. § 106A, was an amendment to the Copyright Act that protects the

-16-

"moral rights" of certain visual artists in the works they create, consistent with Article 6*bis* of the Berne Convention. Phillips v. Pembroke Real Estate, Inc., 459 F.3d 128, 133 (1st Cir. 2006); Carter v. Helmsley-Spear, Inc., 71 F.3d 77, 83 (2d Cir. 1995) (citing H.R. Rep. No. 101-514, at 5 (1990) ("House Report"), as reprinted in 1990 U.S.S.C.A.N. 6915, 6917).[5]  The "rubric of moral rights encompasses many varieties of rights," but the two most widely recognized are attribution and integrity. Id. at 81 (citing Ralph E. Lerner & Judith Bresler, Art Law 417, 420 (1989)).  We will discuss both of these in detail below, but note briefly now that the right of attribution protects the author's right to be identified as the author of his work and also protects against the use of his name in connection with works created by others. Id. The right of integrity "allows the author to prevent any deforming or mutilating changes to his work." Id.  Although these moral rights "exist independent[ly] of the economic rights" granted to all authors under the Copyright Act, 5 William F. Patry, Patry on Copyright § 16:1 (2009), they are part of the same statutory framework.

---

[5] The Berne convention, developed at the instigation of Victor Hugo and first adopted in Berne, Switzerland in 1886, is "'an international copyright treaty providing that works created by citizens of one signatory nation will be fully protected in other signatory nations, without the need for local formalities.'" Phillips, 459 F.3d at 133 n.3 (quoting Black's Law Dictionary, 8th ed. (1999)).

-17-

## A. The Copyright Act

Under the Copyright Act, "[c]opyright protection subsists . . . in original works of authorship fixed in any tangible medium of expression." 17 U.S.C. § 102(a). A copyright owner has certain exclusive rights to the work, which are enumerated in 17 U.S.C. § 106. T-Peg, Inc. v. Vermont Timber Works, Inc., 459 F.3d 97, 108 (1st Cir. 2006). Of particular relevance to this litigation, the copyright holder has the exclusive right to publicly display the copyrighted work and to prepare derivative works based upon it. 17 U.S.C. § 106(5), (2). "One infringes a copyright when he or she violates one of the exclusive rights to a work held by a copyright owner, and the owner has the right to sue for infringement." T-Peg, Inc., 459 F.3d at 108 (citing 17 U.S.C. § 501). The remedies provided by the Copyright Act include injunctive relief and actual or statutory damages. See 17 U.S.C. §§ 502, 504.[6]

## B. VARA

Beyond the Copyright Act's protections of certain economic rights, VARA provides additional and independent

---

[6] Under the Copyright Act, a plaintiff may elect to recover statutory damages instead of actual damages for each work infringed "in a sum of not less than $750 or more than $30,000 as the court considers just." 17 U.S.C. § 504(c)(1). If the copyright owner proves that the infringement was committed willfully, the court "in its discretion" may increase the award of statutory damages to "a sum of not more than $150,000." Id. at 504(c)(2). The award may also be reduced to $200 if the infringer proves that he or she was not aware "and had no reason to believe that his or her acts constituted an infringement of copyright." Id.

protections to authors of works of visual art. See Carter, 71 F.3d at 81-83. A work of visual art is defined to include "a painting, drawing, print, or sculpture,[7] existing in a single copy" or in a limited edition. 17 U.S.C. § 101. The definition specifically excludes a number of works that are otherwise copyrightable, including motion pictures and other audiovisual works, books, posters, periodicals, works made for hire, and merchandising, advertising, promotional, or packaging materials. Id.

VARA provides that, in addition to the exclusive rights provided by section 106 of the Copyright Act, but subject to certain limitations, the author of a work of visual art

> (1) shall have the right —
>
>> (A) to claim authorship of that work, and
>>
>> (B) to prevent the use of his or her name as the author of any work of visual art which he or she did not create;
>
> (2) shall have the right to prevent the use of his or her name as the author of the work of

---

[7] The parties do not dispute that, if completed, "Training Ground for Democracy" would have been a sculpture and therefore a qualified "work of visual art" under VARA. Furthermore, VARA's legislative history states that "[t]he term 'sculpture' includes, but is not limited to, castings, carvings, modelings, and constructions." House Report at 11 (1990), as reprinted in 1990 U.S.C.C.A.N. at 6921 (emphasis added). The Second Circuit in Carter similarly considered VARA's application to a "very large 'walk-through sculpture' occupying most, but not all, of [a] building's lobby." 71 F.3d at 80; see also id. at 84 ("Concededly, considered as a whole, the work is a sculpture and exists only in a single copy.").

-19-

visual art in the event of a distortion, mutilation, or other modification of the work which would be prejudicial to his or her honor or reputation; and

(3) subject to the limitations set forth in section 113(d), shall have the right —

(A) to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right, and

(B) to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right.

17 U.S.C. § 106A(a).

VARA's passage reflected Congress's belief that the art covered by the Act "meet[s] a special societal need, and [its] protection and preservation serve an important public interest." House Report at 5-6, as reprinted in 1990 U.S.C.C.A.N. at 6915-16. To encourage the creation of such art, VARA protects the "moral rights" of its creators. These are "rights of a spiritual, non-economic and personal nature" that exist "independently of an artist's copyright in his or her work" and "spring from a belief that an artist in the process of creation injects his spirit into the work and that the artist's personality, as well as the integrity of the work, should therefore be protected and preserved." Carter, 71 F.3d at 81. The recognition of moral

rights fosters a "'climate of artistic worth and honor that encourages the author in the arduous act of creation.'" Id. at 83 (quoting House Report at 6, as reprinted in 1990 U.S.C.C.A.N. at 6915). Although an artist may not transfer his VARA rights (as they are considered an extension of his personality), he may waive those rights by "expressly agree[ing] to such waiver in a written instrument." 17 U.S.C. § 106A(e)(1). Also, "[a]ll remedies available under copyright law, other than criminal remedies, are available in an action for infringement of moral rights." Carter, 71 F.3d at 83 (citing 17 U.S.C. § 506); see also 17 U.S.C. § 501(a).[8]

More specifically, by guaranteeing the moral rights of "attribution" and "integrity," VARA "'protects both the reputations of certain visual artists and the works of art they create.'" Carter, 71 F.3d at 83 (quoting House Report at 6, as reprinted in 1990 U.S.C.C.A.N. at 6915). Before discussing the precise contours of these rights, we consider whether, as a threshold matter, the indisputably unfinished "Training Ground for Democracy" was a "work of visual art" within the meaning of VARA.

---

[8] Section 501(a) states, in relevant part, that "[a]nyone who violates any of the exclusive rights of the copyright owner . . . or of the author as provided in section 106A(a) [VARA] . . . is an infringer of the copyright or right of the author, as the case may be." The provision further states that, with the exception of the criminal penalties provided under section 506, "any reference to copyright shall be deemed to include the rights conferred by section 106A(a)."

-21-

## C. Does VARA Apply to Unfinished Works of Art?

Büchel argues that the district court erred by failing to recognize that VARA applies with equal force to incomplete artistic endeavors that would otherwise be subject to VARA protection. He asserts that the Act's plain language compels such a conclusion, which he claims is confirmed by the legislative history and sparse case law interpreting the statute. The Museum, for its part, does not argue that unfinished works are excluded from VARA's scope. Instead, it interprets the district court's opinion as "expressly assum[ing]" that VARA applied to "Training Ground for Democracy" in its incomplete state, and then concluding that Büchel had failed to put forth sufficient evidence to raise a triable issue regarding the violation of his rights under the statute.

We do not read the district court's ruling to conclude categorically that VARA does not apply to unfinished works. Rather, the court held that, if the statute applied, "display of th[e] unfinished installation would have violated neither Büchel's right of attribution nor his right of integrity." 565 F. Supp. 2d at 259. Nonetheless, the court repeatedly expressed skepticism about Büchel's claim that the incomplete "Training Ground" fell within VARA's scope, observing at one point in its opinion that "unfinished art may not be covered by VARA at all." Id. at 258; see also id. at 259 ("[I]t is doubtful that VARA even covered the assembled materials that constituted this unfinished

installation."). Moreover, the court qualified the statute's application to unfinished works: "To the extent that an artist seeks protection for an uncompleted work, a violation of one of VARA's two explicitly recognized rights must be demonstrated with special clarity." Id. at 258.

Our review of the district court's interpretation of VARA is de novo. Phillips, 459 F.3d at 139. "'As in all statutory construction cases, we begin with the language of the statute,'" id. (quoting Barnhart v. Sigmon Coal Co., 534 U.S. 438, 450 (2002)), and "[i]f the meaning of the text is unambiguous our task ends there as well," United States v. Godin, 534 F.3d 51, 56 (1st Cir. 2008). "If the statute's language is plain, the sole function of the courts - at least where the disposition required by the text is not absurd - is to enforce it according to its terms." In re Rudler, 576 F.3d 37, 44 (1st Cir. 2009) (quotation marks and citations omitted).

The definition of a "work of visual art" for VARA purposes is stated "in terms both positive (what it is) and negative (what it is not)." Carter, 71 F.3d at 84. An unfinished sculptural installation such as "Training Ground for Democracy" is not one of the items specifically excluded from VARA protection,[9]

---

[9] As provided in 17 U.S.C. § 106A(c)(3), VARA specifically excludes certain categories of artwork listed in section 101 of the Copyright Act:

(A) (i) any poster, map, globe, chart, technical

and MASS MoCA wisely does not attempt to argue otherwise. Instead, we must determine whether the "positive" aspect of the definition of "work of visual art" includes an unfinished version of a "sculpture[] existing in a single copy." 17 U.S.C. § 101.

The text of VARA itself does not state when an artistic project becomes a work of visual art subject to its protections. However, VARA is part of the Copyright Act, and that Act's definition section, which defines "work of visual art," specifies that its definitions, unless otherwise provided, control throughout Title 17. See 17 U.S.C. § 101. That general definitional section of the Copyright Act states that a work is "created" when it "is fixed in a copy . . . for the first time." Further, "where a work is prepared over a period of time, the portion of it that has been fixed at any particular time constitutes the work as of that time." 17 U.S.C. § 101 (emphasis added). A work is "fixed" when it has been formed, "by or under the authority of the author," in a way

---

drawing, diagram, model, applied art, motion picture or other audiovisual work, book, magazine, newspaper, periodical, data base, electronic information service, electronic publication, or similar publication;
(ii) any merchandising item or advertising, promotional, descriptive, covering, or packaging material or container;
(iii) any portion or part of any item described in clause (i) or (ii);

    (B) any work made for hire

17 U.S.C. § 101.

that is "sufficiently permanent or stable to permit it to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration."  Id.

Not surprisingly, based on section 101's general definitions, courts have held that the Copyright Act's protections extend to unfinished works.  See, e.g., Dumas v. Gommerman, 865 F.2d 1093, 1097 (9th Cir. 1989), rejected on other grounds by Community for Creative Non-Violence v. Reid, 490 U.S. 730, 739, 742 n.8 (1989); Zyware, Inc. v. Middlegate, Inc., No. 96 Civ. 2348 (SHS), 1997 WL 685336, at *4 (S.D.N.Y. Nov. 4, 1997) (noting that there is "no requirement that a work be complete before it is protected by the Copyright Act"); Playboy Enters. Inc. v. Dumas, 831 F. Supp. 295, 314 (S.D.N.Y. 1993) ("[T]he [Copyright] Act protects works in progress."), modified on other grounds by 840 F. Supp. 256 (S.D.N.Y. 1993), aff'd in part, rev'd in part by 53 F.3d 549 (2d Cir. 1995).

Reading VARA in accordance with the definitions in section 101, it too must be read to protect unfinished, but "fixed," works of art that, if completed, would qualify for protection under the statute.[10]  To conclude otherwise would be

---

[10] Nothing in the language of VARA or the definitions provision of the Copyright Act permits distinct treatment for the rights of copyright owners whose works are complete and those whose works are still in progress.  We therefore reject the "special clarity" standard articulated by the district court for proving a violation of an artist's VARA rights in an unfinished work of art.

"contrary to the rule that provisions of a single act should be construed in as harmonious a fashion as possible." United States v. Maravilla, 907 F.2d 216, 231 (1st Cir. 1990) (citation omitted). At least one circuit has previously assumed VARA's applicability to unfinished works. See Carter, 71 F.3d at 83-88 (discussing VARA claims stemming from an unfinished, walk-through sculpture being installed in the lobby of a building).[11]

Our conclusion that the statute's plain language extends its coverage to unfinished works makes it unnecessary to delve into VARA's legislative history. We nonetheless note that we have looked closely at that history, and it fully supports our reading of the plain language. Common sense points in the same direction. Moral rights protect the personality and creative energy that an artist contributes to his or her work. That convergence between artist and artwork does not await the final brush stroke or the placement of the last element in a complex installation. See, e.g., Monica Pa & Christopher J. Robinson, Making Lemons out of Lemons: Recent Developments in the Visual Artists Rights Act, 3 Landslide 22, 24 (Jan./Feb. 2009) ("[T]he history of art is full of sublime 'unfinished' works of art, such as Leonardo da Vinci's Statue of a Horse (begun 1488), Michelangelo's Tomb of Pope Julius II (begun 1505), or El Greco's The Vision of St. John (1608-14).");

_____

[11] The Second Circuit ultimately found that the sculpture was exempted from VARA protections because it was a "work for hire." See 71 F.3d at 86-88.

Laura Flahive Wu, Massachusetts Museum of Contemporary Art v.
Büchel: Construing Artists' Rights in the Context of Institutional
Commissions, 32 Colum. J.L. & Arts 151, 163 (2008) (noting that
"many works are considered 'art' even though they capture creative
expression short of an artist's ultimate realization of that
expression").

We thus hold that VARA protects the moral rights of
artists who have "created" works of art within the meaning of the
Copyright Act even if those works are not yet complete.[12]

**III.**

Given Büchel's right to protection under VARA for his
artistic investment in a partially completed artwork, we must now
assess the district court's ruling that Büchel failed to raise a
genuine issue of material fact with respect to any of his claims.
We review the district court's grant of summary judgment de novo.
Insituform Techs., Inc. v. Am. Home Assur. Co., 566 F.3d 274, 276

---

[12] Our decision in Phillips is not inconsistent with this
holding. In Phillips, we held that VARA did not apply to site-
specific works of art, in which the particular location of the
artwork is one of its physical elements and removal of the artwork
destroys it. 459 F.3d at 140. We observed that VARA does not
explicitly address protection for site-specific works despite the
impact of such works on real property interests, id. at 142, and we
declined to interpret VARA in a way that was neither supported by
the statutory language nor sensible as policy. See id. at 142-43.
Here, the plain language controls, and there is no conflict with
"'long-established and familiar principles'" of the common law.
Id. at 142 (quoting United States v. Texas, 507 U.S. 529, 534
(1993)).

(1st Cir. 2009).  "The presence of cross-motions neither dilutes nor distorts this standard of review."  Scottsdale Ins. Co. v. Torres, 561 F.3d 74,77 (1st Cir. 2009) (quotation marks and citations omitted); see also Littlefield v. Acadia Ins. Co., 392 F.3d 1, 6 (1st Cir. 2004) ("Cross motions simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed.") (quotation marks and citation omitted).  Summary judgment is appropriate where "there is no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c)(2); see also Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009).  "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in favor of the non-moving party.  A fact is 'material' if it has the potential of determining the outcome of the litigation."  Scottsdale Ins. Co., 561 F.3d at 77 (citation omitted).

We first consider Büchel's claims asserting violations of his attribution and integrity rights under VARA and then address his claims under other provisions of the Copyright Act, which assert violations of his rights to control the display of the installation and to create derivative works based on it.

## A. The Scope of VARA's Integrity and Attribution Rights

### 1. The Right of Integrity

VARA's right of integrity, codified at 17 U.S.C. § 106A(a)(3)(A), provides that an artist shall have the right "to prevent any intentional distortion, mutilation, or other modification of [his or her] work which would be prejudicial to his or her honor or reputation, and [that] any intentional distortion, mutilation, or modification of that work is a violation of that right." It thus allows artists to protect their works against intentional modifications that would be prejudicial to their honor or reputations. House Report at 6, as reprinted in 1990 U.S.C.C.A.N. at 6915.[13]

There is arguably some uncertainty about the plaintiff's burden of proof in a case such as this because the second part of section (a)(3)(A) – stating that "any intentional distortion, mutilation, or modification of th[e] work is a violation" of the right of integrity – does not explicitly require a showing of prejudice when the alteration already has occurred and damages, rather than injunctive relief, would be the appropriate remedy. See 5 Patry, supra, § 16:22 (noting the ambiguity). Because those VARA cases that make it to court are "generally . . . decided on

---

[13] In some jurisdictions, the right of integrity also generally protects artwork from destruction. See Carter, 71 F.3d at 81. In the United States, however, VARA protects only works of "recognized stature" from destruction. 17 U.S.C. § 106A(a)(3)(B). That right is not implicated in this case.

threshold questions such as whether the artist's work is a work of visual art within the scope of the Act," Pa & Robinson, supra, at 26, courts have had little occasion to give content to the rights that VARA guarantees. See Wu, supra, at 159 ("[C]ourts avoid construing the extent of VARA protection by finding that works do not meet the threshold requirements for 'visual art' protected by VARA."). Unsurprisingly, therefore, we have found no case law discussing a possible difference in the showing required for injunctive relief and damages for right-of-integrity claims.

Some courts, however, have assumed without analysis that the prejudice showing is necessary for both injunctive relief and damages. See, e.g., Hanrahan v. Ramirez, No. 2:97-CV-7470, 1998 WL 34369997, at *3 (C.D. Cal. June 3, 1998) (citing 17 U.S.C. § 106A(a)(3)); Carter v. Helmsley-Spear,Inc., 861 F. Supp. 303, 329-30 (S.D.N.Y. 1994), aff'd in part, vacated in part, and rev'd in part by Carter, 71 F.3d at 77. At least one commentator likewise accepts, without discussion, that the damages remedy requires a showing of prejudice. See Melville B. Nimmer, 3-8D Nimmer on Copyright § 8D.06[C][1] (noting that "an intentional and prejudicial mutilation is an integrity violation, remediable through not only an injunction, but damages as well"). Interestingly, Nimmer raises, and dismisses, a different imprecision in section (a)(3)(A):

> The statutory language – "distortion, mutilation, or other modification of the work

-30-

which would be prejudicial to his or her honor
or reputation" – is susceptible of a reading
whereby the requisite prejudice applies only
to "modification," not to the antecedents of
"distortion" or "mutilation." Though not
without ambiguity, the better view under the
Berne Convention, from which this language is
drawn, is that prejudice applies in all three
instances.

Id.

We agree with Nimmer's view of the provision, including

the application of the prejudice requirement to a claim for

damages, and consider that construction soundly grounded in VARA's

legislative history. Under the heading "Purpose of the

Legislation," the House Report notes that the right of integrity

"allows artists to protect their works against modifications and

destructions that are prejudicial to their honor or reputations."

House Report at 6, as reprinted in 1990 U.S.C.C.A.N. at 6915. The

Report also notes that the rights provided by VARA are "analogous

to those protected by Article 6bis of the Berne Convention," id.,

which in turn describes the right of integrity as applicable to

"certain modifications and other derogatory actions" that would be

prejudicial to the artist's honor or reputation.[14] Given the stated

_____

[14] Article 6*bis* of the Berne Convention, which is titled "Moral
Rights," includes a heading that lists among those rights "to
object to certain modifications and other derogatory actions." The
provision itself states, in relevant part:

(1) Independently of the author's economic rights, and
even after the transfer of the said rights, the author
shall have the right . . .to object to any distortion,
mutilation or other modification of, or other derogatory

-31-

purpose of the legislation and the similar depiction of the integrity right in the Berne Convention, we conclude that Congress intended the prejudice requirement to apply to the right of integrity whether the remedy sought is injunctive relief or damages.[15]

Although VARA does not define the terms "prejudicial," "honor," or "reputation," the House Report recommended that the prejudice inquiry "focus on the artistic or professional honor or reputation of the individual as embodied in the work that is protected," and "examine the way in which a work has been modified and the professional reputation of the author of the work."  House

---

action in relation to, the said work, which would be prejudicial to his honor or reputation.

Berne Convention for the Protection of Literary and Artistic Works art. 6*bis*, Sept. 9, 1986, S. Treaty Doc. No. 99-27, 1161 U.N.T.S. 30.

[15] Based on revisions to the statutory language made during the legislative process, Patry concludes that "where an intentional distortion, mutilation, or other modification has already occurred, the plaintiff need not prove harm to his or her honor or reputation."  5 Patry, supra, § 16:22.  He further states, without supporting citation, that "[i]t was understood informally" that the final version of the provision was designed "to permit a cause of action . . . without the need for proof that the artist's honor or reputation was harmed."  Id.  To the extent Patry's conclusion is that no evidence of harm is necessary, we reject it as inconsistent with the available legislative history, as discussed above.  It may be, however, that Congress's concern was only that a plaintiff not be required to prove the actual amount of damage to reputation, but could opt for the statutory damages remedy upon showing prejudice. See 17 U.S.C. §§ 501(a), 504(c) (stating that a VARA plaintiff may elect to recover statutory damages instead of actual damages and profits).

Report at 15, as reprinted in 1990 U.S.C.C.A.N. at 6925-26 (footnotes omitted). Relying on dictionary definitions of prejudice, honor and reputation, the district court in Carter concluded that it should "consider whether [the proposed] alteration would cause injury or damage to plaintiffs' good name, public esteem, or reputation in the artistic community." 861 F. Supp. at 323. We think this a useful approach, but emphasize that the focus is on the artist's reputation in relation to the altered work of art; the artist need not have public stature beyond the context of the creation at issue. See House Report at 15, as reprinted in 1990 U.S.C.C.A.N. at 6925 ("[A]n author need not prove a pre-existing standing in the artistic community.").

2. The Right of Attribution

VARA's right of attribution grants the author of a work of visual art the right, in part, (1) "to claim authorship of that work"; (2) "to prevent the use of his or her name as the author of any work of visual art which he or she did not create"; and (3) "to prevent the use of his or her name as the author of the work of visual art in the event of a distortion, mutilation, or other modification of the work which would be prejudicial to his or her honor or reputation." 17 U.S.C. § 106A(a)(1),(2). The right "ensures that artists are correctly identified with the works of art they create, and that they are not identified with works created by others." House Report at 6, as reprinted in 1990

-33-

U.S.C.C.A.N. at 6915.  In addition, if a work of visual art has been distorted or modified (and, unlike the integrity right, the original distortion or modification need not be intentional), associating the author's name with the distorted work against his wishes would violate his right of attribution.

The right of attribution under VARA thus gives an artist a claim for injunctive relief to, inter alia, assert or disclaim authorship of a work.  Whether VARA entitles an artist to damages for violation of the right of attribution is a separate question. We find the answer in the difference between the statutory language on the right of integrity and the language on the right of attribution.  Subsection (a)(3) of section 106A, which codifies the right of integrity, is further divided into two subsections: (A) confers the right to protect the work against intentional alterations that would be prejudicial to honor or reputation, and (B) confers the right to protect a work of "recognized stature" from destruction.[16]  Although both subsections are framed as rights "to prevent" certain conduct, they both also contain an additional clause stating that the occurrence of that conduct is, at least in certain circumstances, "a violation of th[e] right" to prevent the

---

[16] Section 106A(a)(3) states that the author of a work of visual art shall have the right "(A) to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation" and the right "(B) to prevent any destruction of a work of recognized stature."

conduct from happening. See 17 U.S.C. § 106A(a)(3)(A) ("any intentional distortion, mutilation, or modification of that work is a violation of that right"); id. at § 106(a)(3)(B) ("any intentional or grossly negligent destruction of that work is a violation of that right").

No such "violation" clause is included in the sections codifying the right of attribution. See Nimmer, supra, at § 8D.06[B][1] ("The statute does not make any provision to redress violation of any of the foregoing three attribution rights."). The legislative history sheds no light on this difference, but Nimmer speculates as follows:

> Perhaps the implication is that whereas an integrity violation could give rise to a monetary recovery, failure to attribute is remediable solely through injunction. If that conclusion were intended, Congress certainly could have expressed its intent less obliquely.

Id. We agree with Nimmer's surmise that VARA does not provide a damages remedy for an attribution violation. Where the statutory language is framed as a right "to prevent" conduct, it does not necessarily follow that a plaintiff is entitled to damages once the conduct occurs. The question is whether "doing" the act the artist has a right to prevent also triggers a damages remedy, and the statutory language indicates that Congress answered that question for the attribution right differently from the integrity right.

It is also noteworthy that Congress crafted a damages remedy for the destruction of a work of recognized stature that is narrower than the right to prevent destruction of such works. While an artist may "prevent any destruction of a work of recognized stature," only an "intentional or grossly negligent destruction of that work is a violation of that right." 17 U.S.C. § 106A(a)(3)(B) (emphasis added). This narrowing further indicates that Congress did not intend a damages remedy to arise automatically from the right to prevent conduct. In failing to provide a damages remedy for any type of violation of the moral right of attribution, Congress may have concluded that artists could obtain adequate relief for the harms of false attribution by resorting to the Copyright Act and other traditional claims.

**B. Büchel's VARA Claims**

With this legal framework in mind, we turn to the record before the district court. By dismantling "Training Ground," the Museum prevented the further use of Büchel's name in connection with the work, eliminating any basis for injunctive relief, and we therefore do not address the attribution claim in our VARA analysis. We thus consider the evidence in the light most favorable to Büchel in determining whether there are genuine issues of material fact regarding the alleged violations of his right of integrity.

As noted above, the district court concluded that Büchel's right of integrity was not implicated by MASS MoCA's conduct. The court found that "nothing in MASS MoCA's planned display of the unfinished installation would have violated Büchel's right of integrity, for the simple reason that no completed work of art ever existed on these facts for the museum to distort, mutilate or modify." 56 F. Supp. 2d at 260. Although the court stated that it would assume that VARA applied to unfinished works, its analysis appears to be influenced by a more limited view of the statute's scope. The court stated that "[t]o suggest that the display of an unfinished and abandoned work somehow constitutes a distortion, mutilation, or modification of that non-existent work is simply inconsistent with the ordinary usage of those terms." Id. Having concluded that VARA applies with full force to unfinished works, however, we cannot accept the district court's reliance on the unfinished state of "Training Ground" to minimize the rights of its creator.

It cannot be disputed that, at least by the time Büchel left North Adams in December 2006, "Training Ground" was "fixed" within the meaning of the Copyright Act – i.e., materials had been placed in Building 5 "by or under the authority of the author" in a "sufficiently permanent or stable" manner to allow the work to be "communicated for a period of more than transitory duration." 17 U.S.C. § 101. The elements of the installation had been chosen by

Büchel, and his assistants and the Museum workers had put numerous components of the project in place under his direct supervision. Although far from complete, the work by the end of 2006 included parts of the "Saddam Compound" and the cinema, and Büchel and his assistants had begun detailing several of the containers intended to house elements such as a jail, museum and voting booths. With this substantial work in place, the sculpture had an established presence in Building 5. Büchel thus had rights in the work that were protected under VARA, notwithstanding its unfinished state.

Büchel alleges that MASS MoCA violated his right to integrity in three distinct ways: first, by continuing to work on the installation without his authorization, particularly in early 2007, and by then exhibiting the distorted artwork to the public; second, by using tarpaulins to "partially cover[]" – and thus modify and distort – the installation, and allowing Museum visitors to see it in that condition; and third, merely by showing Büchel's work in its unfinished state, which he claims was a distortion. Büchel asserts that these actions caused prejudice to his honor or reputation.

As we shall explain, we conclude that summary judgment was improperly granted to MASS MoCA because material disputes of fact exist concerning the first of Büchel's integrity claims – i.e., that MASS MoCA modified "Training Ground" over his objections, to his detriment. We further conclude that the record

contains sufficient evidence to allow a jury to find that MASS MoCA's actions caused prejudice to Büchel's honor or reputation. The other integrity claims, however, are unavailing.

1. Continuing Work on "Training Ground"

Büchel asserts that, in the months following his departure from North Adams in December 2006, the Museum encroached on his artistic vision by making modifications to the installation that in some instances were directly contrary to his instructions. In rejecting Büchel's VARA claims, the district court described the Museum's actions as perhaps "occasionally misguided" attempts "to implement Büchel's long-distance instructions." 565 F. Supp. 2d at 260. The court found that these "[f]umbled efforts to assist in creating, or failing to create, a work of art are not equivalent to distortion, modification, or mutilation of the art." Id. at 260-61.

Although a jury might agree with the court's assessment, the evidence viewed in the light most favorable to Büchel would allow a finding that at least some of the Museum's actions violated VARA. The record permits the inference that, even during his time as an artist-in-residence at MASS MoCA, Museum staff members were disregarding his instructions and intentionally modifying "Training Ground" in a manner that he did not approve. For example, on December 14, 2006, just before he left for the holidays, Büchel complained to Thompson that in "many cases people just do stuff

without checking back if its ok to do s[omething], when they think by themselves the plan has to be changed." Büchel expressed further concerns in an email to Thompson later that month: "I don't [k]now if this is really a great opportunity when you get an invitation to do a show, where you have to make constantly tons of compromises, where you have to fight constantly against stubborn[n]ess as well [as] against the institution and work with people that think they know my art better than i do as well [as] try to sabotage the project . . . ."

In early 2007, when he was no longer on-site, Büchel again accused the Museum of "sabotage acts" and, in a January 16 letter, issued an ultimatum: he would return to North Adams to complete "Training Ground" only if the Museum assented to a number of specific conditions. Aside from certain budgetary concerns irrelevant here, Büchel included the following among his list of demands:

> There is NO negotiation about the scope of the project.
> There are no elements to be eliminated as you propose and I don't accept any orders and any more pressure or compromises how things have to be done, neither from you or your crew . . . .
> I will not give you any permission to show an unfinished project nor will I show nor let you show any work in progress, as you proposed already earlier.
> I will not accept without consequences any additional sabotage acts, as done to artworks of mine and as well done to the installation in progress[.]

The letter also identified several points of disagreement with the Museum concerning the content of the project, including Büchel's insistence that there be "no transport street through the exhibition" and that he did not "need to be told if an airplane fuselage section fits in the show or not.  I don't negotiate constantly my art with you or Nato . . . ."  Accusing the Museum director of showing "little respect towards [his] plans," he told Thompson "please don't tell me all the time how I have to do my project regarding its scope and it's [sic] methods that needs [sic] to be applied."

Unsatisfied with the Museum's response to his list of demands, Büchel wrote to Thompson again on January 27, 2007.  He warned that, based on the information he had been provided, "there [was] a lot of stuff not being done according to my instructions." Again, he noted several elements of the work that had been installed against his wishes.[17]  Thompson and Büchel traded emails during the first few days of February, with Büchel stating that he would "not negotiate further this matter . . . because almost any of the main conditions are simply not fulfilled" and Thompson writing that he believed the Museum had "responded to [Büchel's] main issues."

---

[17] "I wrote very clearly immediately to [Dante Birch, the Museum's production manager] not to use the method we talked about and stop it . . . , as well cinder block walls have to be partly redone that have been built without my instruction . . . ."

After that, direct communication between Büchel and the Museum became sparse. It was during this time, Büchel alleges, that the Museum developed a "Plan B"[18] to be implemented in the event – which was looking increasingly likely – that he did not return to finish the exhibit. Plan B, which involved publicly exhibiting the unfinished installation without the artist's permission, called for completing various elements of the installation in a way the Museum knew might differ from Büchel's artistic concept. Büchel cites an email chain on February 14 that included Joseph Thompson and Dante Birch, in which Thompson, stating that the Museum "seem[ed] to be getting closer and closer to Plan B," gave specific instructions on various elements of the installation. Thompson suggested that Museum staff do "[a]nything else Dante and Nato feel is known with 80% certainty."

At least some Museum staff members recognized that continuing to work on the installation without Büchel's input might be problematic. Later in the February 14 email chain, Dante Birch noted that he was "interested in protecting the museum from intellectual property issues." Pointing out that the show was advertised as a Büchel in the Museum's schedule, he stated that when reviewers came, "the question will be 'what is it?' . . . and if it's reviewed as a Buchel we're in deep shit." Thompson's plans

---

[18] The term "Plan B" appears in the record in a February 14, 2007 email from Thompson to other Museum staff.

also raised concern among other MASS MoCA employees, including curator Susan Cross, who cautioned Thompson in a January 31 email that "we tend to forget that whether we're doing the welding or not, there is an 'author' – an artist for whom we shouldn't make decisions. . . . At what point, if at all, does an artist lose his right to owning the idea and his/her 'intellectual property?' . . . I think it is still art and still belongs to Buchel."

Both in his deposition and in his affidavit, Büchel described ways in which he felt the Museum had knowingly disregarded his specific instructions. For example, MASS MoCA's decision to build a cinderblock wall through the Cape Cod-style house in the installation, despite Büchel's expressed desire that the construction await his return, resulted in what Büchel considered a "big distortion of the meaning of that element." The record is replete with similar allegations concerning other components of the installation, including the cinema, the bomb carousel, the Saddam spiderhole, the police car and the mobile home. Indeed, even the Museum, in its August 31, 2007 memorandum of law in support of its motion for summary judgment, admitted that the installation "[m]aterials as they now stand reflect significant aesthetic and design choices by MASS MoCA personnel, including with respect to the layout of the [m]aterials, and with respect to the selection and procurement of pre-existing buildings and vehicles

-43-

that have been modified and incorporated into the [m]aterials."
(Emphasis added.)[19]

MASS MoCA argues that the evidence, taken in its
entirety, does not add up to a triable issue with respect to a
violation of Büchel's right of integrity, but shows only that
Museum personnel were attempting to carry out Büchel's vision based
on his instructions. Indeed, the Museum notes that the work slowed
as Büchel's instructions became unavailable.[20] MASS MoCA
specifically disputes Büchel's reading of the February 14 email
chain as demonstrating the Museum's disregard of his creative

---

[19] This assertion by MASS MoCA was made to support its
contention, rejected by the district court and halfheartedly
renewed on appeal, that the unfinished installation might
constitute a joint work of Büchel and the Museum. A claim of joint
authorship requires proof that the parties "entertain in their
minds the concept of joint ownership." Thomson v. Larson, 147 F.3d
195, 201 (2d Cir. 1998) (quotation marks and citation omitted).
Here, multiple facts indicate that the parties' understanding from
the outset was that "Training Ground" was solely a Christoph Büchel
work of art. The Museum's December 6, 2006 postponement
announcement described the work as "Christoph Büchel's vast
installation" and, as reflected in the emails described above,
Museum personnel internally recognized Büchel as the artist, at
least as "Training Ground" was originally conceived. It is also
undisputed that, at the outset of their relationship, the parties
had agreed that Büchel alone would hold the copyright in the
finished work. These facts negate any claim of joint authorship.

[20] In his deposition, Thompson testified as follows:

[T]here was a whole long list of things for which we had
adequate direction and understanding that we could
continue forward to a certain point. When the work began
to get very detailed and would require input from
Christoph, if we could get the input from him, we would
continue, and if we didn't, we would stop.

rights over the installation, asserting that the discussion among its staff members in fact reflects a conscious effort to determine how far the Museum could appropriately go in light of the remaining instructions left by the artist. In one email, for example, Thompson noted that "we are putting the correct objects in the spaces cb indicated . . . . That's not 'doing a buechel [sic]' that's prepping for buechel [sic] assuming, as we still are, that there is some chance we'll see him here again." Other communications in the record also could be interpreted as showing the Museum doing its best to carry out Büchel's concept for the art work.

As we have noted, a jury may well accept the Museum's depiction of its intention and its actions. At this juncture, however, the record must be viewed in the light most favorable to Büchel. The evidence we have described would permit a jury to find that the Museum forged ahead with the installation in the first half of 2007 knowing that the continuing construction in Büchel's absence would frustrate – and likely contradict – Büchel's artistic vision. We thus conclude that a jury issue exists as to whether these actions effected an intentional distortion or other modification of "Training Ground" that subjected MASS MoCA to liability under VARA.

The record also contains evidence from which a jury could conclude that the Museum's alterations had a detrimental impact on

Büchel's honor or reputation. An article in the Boston Globe reported that, in February, Museum officials had shown the unfinished project to a group of Museum directors and curators who were attending an arts conference in the area. See Geoff Edgers, Behind doors, a world unseen: Dispute cloaks massive installation at MASS MoCA, Boston Globe (March 28, 2007), available at www.boston.com/ae/theater_arts/articles/2007/03/28/behind_doors_a _world_unseen/ ("Behind doors, a world unseen"). Another journalist reported on observing the unfinished (and still untarped) work. See The Show Will Go On, supra.

Although the commentary generated by these visits is not all negative,[21] there was sufficient evidence for a jury to find that the changes to "Training Ground" caused prejudice to Büchel. The New York Times noted that the exhibition would "certainly give people unfamiliar with his obsessive, history-driven aesthetic an inaccurate sense of his art, and this is indeed a form of damage." Is It Art Yet?, supra. A critic for the Boston Globe similarly observed that "many people are going to judge [Büchel] and his work on the basis of this experience." Ken Johnson, No admittance: MASS MoCA has mishandled disputed art installation, Boston Globe, July 1, 2007, at 1N. One viewer, writing in Commentary magazine,

_____

[21] Thompson told an outside consultant for the Museum in March 2007 that a curator at the New Museum in New York had just viewed the installation "and said it was one of the best works he's seen in the past three years."

observed that "I am not sure that it suffers from being enveiled." Michael J. Lewis, <u>The Cost of Transgression</u>, http://www.commentarymagazine.com/blogs/index.php/lewis/499 (June 4, 2007). A review published in <u>Berkshire Fine Arts</u> – subtitled "Crap Under Wrap" – concluded that it would be a "huge mistake" to uncover the installation, which offered "virtually nothing of substance or interest." <u>Crap Under Wrap</u>, <u>supra</u>.

The record thus shows that some viewers of the installation reacted unfavorably to the work in its allegedly modified and distorted form. A factfinder might conclude, of course, that it was Büchel's underlying concept (notwithstanding its unfinished state) rather than MASS MoCA's actions that elicited the negative reactions. However, a jury could also reasonably infer that the negative impressions resulted from the Museum's unauthorized modifications to "Training Ground," diminishing the quality of the work and thereby harming Büchel's professional honor or reputation as a visual artist.

In concluding that Büchel has adduced sufficient evidence to support a right-of-integrity claim, we reject the Museum's assertion that to find a violation of Büchel's right of integrity in these circumstances would make it impossible for parties to collaborate on large-scale artistic works. The Museum warns that, under Büchel's interpretation, "no one other than the artist himself . . . may <u>ever</u> perform any work in fabricating

visual art unless that specific task has been authorized by the artist." We disagree. Although the artist's vision must govern, that principle does not prevent collaboration at the implementation level so long as the artist's vision guides that implementation. Here, Büchel alleges a campaign of intentional distortion and modification to his work in which Museum personnel repeatedly ignored his express wishes. Our holding that the summary judgment record precludes an affirmance of the district court on this claim may serve as a cautionary tale to museums contemplating similar installations in the future – guiding them to document the terms of their relationship and obtain VARA waivers where necessary – but it does not prevent museums or other collaborators from working cooperatively with artists on such non-traditional artworks.

2. Showing "Training Ground" Covered with Tarpaulins

Büchel also claims that MASS MoCA improperly modified and distorted "Training Ground" when it partially covered it with the yellow tarpaulins and displayed it in that condition. He asserts that the record shows beyond dispute that visitors looked behind the tarps, that the tarp-adorned installation was "judged by others to be Büchel's work, and that his honor and reputation were harmed by it." In response, the Museum argues that the yellow tarpaulins were merely functional – a way of keeping people "out" of the installation – rather than an aesthetic modification of the artwork that gave MASS MoCA patrons a distorted view of it.

Although the tarpaulins did prevent visitors to the Museum from seeing the entire unfinished installation, the record shows that a number of people were able to form an impression of "Training Ground" despite the partial covering.  For example, according to one observer,

> [the tarps] don't reach the floor, and they rise only about two feet above eye level, so they don't cover much.  You can easily crouch down to slip your head underneath or peek through the slits between the vinyl sheets. Beyond the passageway formed by the tarps, the monumental elements of the installation rise all around you, plain as day — the cinderblock walls, the two-story house, the guard tower, the trailers, the carnival ride, all compacted together in a claustrophobic, politically surreal borough of hell, George Orwell by way of David Lynch.

Thomas Micchelli, <u>Christoph Büchel Training Ground for Democracy</u>, The Brooklyn Rail (September 2007), <u>available at</u> <u>http://www.brooklynrail.org/2007/09/artseen/buchel</u>. Another critic noted that the installation "under all the tarps is really kind of a conceptual peep show.  It doesn't take much effort or imagination to see most of the work . . . .  Mass MoCA is hiding an elephant behind a napkin," and called it a "wink, wink, wrap show."  <u>Crap Under Wrap</u>, <u>supra</u>.  Photographs in the record confirm that the covers did not obscure the general path and layout of the installation.  Indeed, given the location of "Training Ground," visitors to "Made at MASS MoCA" could not avoid seeing the unfinished "Training Ground" bedecked in tarpaulins.

Nonetheless, although the installation unquestionably looked different with the tarpaulins partially covering it, we agree with the district court that the mere covering of the artwork by the Museum, its host, cannot reasonably be deemed an intentional act of distortion or modification of Büchel's creation. To conclude otherwise would be to say that, even if all had gone well, the Museum would have been subject to a right-of-integrity claim if it had partially covered the work before its formal opening to prevent visitors from seeing it prematurely.

This is not to say that MASS MoCA was necessarily acting with pure intentions when it created "Made at MASS MoCA" in close proximity to the tarped "Training Ground." It might be a fair inference that the Museum was deliberately communicating its anger with Büchel by juxtaposing his unfinished work with the successful artistic collaborations depicted in its new exhibition. The partial covering of "Training Ground" may have been intended to highlight, rather than hide, the failed collaboration.[22] The right of integrity under VARA, however, protects the artist from distortions of his work, not from disparaging commentary about his

---

[22] Indeed, the Boston Globe's art critic, Ken Johnson, described the exhibit as a "self-serving photo and text display" that implicitly conveys criticism of Büchel for the failure of "Training Ground for Democracy." See MASS MoCA has Mishandled Disputed Art Installation, supra. The juxtaposition left Johnson with the impression that MASS MoCA was "exacting revenge" against the artist "by turning his project into a show that misrepresents, dishonors, vilifies, and even ridicules him." Id.

behavior. In our view, a finding that the Museum's covering of the installation constituted an intentional act of distortion or modification of Büchel's artistic creation would stretch VARA beyond sensible boundaries.

3. Exhibiting "Training Ground" in Its Unfinished State

Büchel maintains that, even aside from the alleged modifications to "Training Ground," merely exhibiting the work of art in its unfinished state, without the artist's consent, constitutes a distortion. We reject this claim. A separate moral right of disclosure (also known as the right of divulgation) protects an author's authority to "prevent third parties from disclosing [his or her] work to the public without the author's consent," and is not covered by VARA. See Cyrill P. Rigamonti, Deconstructing Moral Rights, 47 Harv. Int'l L.J. 353, 373, 405 (2006) "([T]he VARA ignores the rights of disclosure and withdrawal and instead focuses on the rights of attribution and integrity . . . .").

Although Büchel proffered an expert who opined that showing an unfinished work without the artist's permission is inherently a distortion, we decline to interpret VARA to include such a claim where a separate moral right of disclosure is widely recognized in other jurisdictions and Congress explicitly limited the statute's coverage to the rights of attribution and integrity. See Amy M. Adler, Against Moral Rights, 97 Cal. L. Rev. 263, 268

(2009) (noting that most European countries "recognize a right of divulgation, giving the artist the right to decide when (and whether) the work is complete and can be shown"); Rigamonti, supra, at 356 ("The standard set of moral rights recognized in the literature consists of the author's right to claim authorship (right of attribution), the right to object to modifications of the work (right of integrity), the right to decide when and how the work in question will be published (right of disclosure), and the right to withdraw a work after publication (right of withdrawal)." (footnotes omitted)); 5 Patry on Copyright § 16:23 (noting that VARA does not give the artist "a right to prohibit display of mutilated versions of his or her work, only the right to prohibit the mutilation itself"). Any right Büchel possesses to withhold display of his artwork must be found outside VARA. We consider below his claim to such a right under section 106(5) of the Copyright Act. See infra Section IV.

4. Summary of VARA Claims

After careful review of the record, we are persuaded that a reasonable jury could find that Büchel is entitled to relief under VARA based on the Museum's continuing work on "Training Ground" over his objections. Genuine disputes of material fact foreclose summary judgment for either Büchel or MASS MoCA on that claim. We find no merit, however, in Büchel's claim that MASS MoCA intentionally modified or distorted "Training Ground" by covering

it with tarpaulins, and we reject as outside the scope of the statute Büchel's claim that the Museum violated VARA by displaying the installation over his objections.  We affirm the district court's grant of summary judgment for the Museum on Büchel's right-of-attribution claim, which became moot when MASS MoCA dismantled the installation in 2007.

## IV.

We now assess Büchel's challenge to the grant of summary judgment for MASS MoCA on his Copyright Act claims.

### A. Public Display

The owner of a copyrighted work has the exclusive right to "display the copyrighted work publicly."  17 U.S.C. § 106(5). Displaying a work is defined as "show[ing] a copy of it, either directly or by means of a film, slide, television image, or any other device or process."  17 U.S.C. § 101.  A "copy" includes the original.  Id.  Büchel argued below, as he does on appeal, that the Museum's repeated public exhibitions of "Training Ground for Democracy" constituted a public display of his work in violation of his exclusive right under section 106(5).  The district court gave no explicit reason for its dismissal of this claim, remarking only that "[f]or the reasons already stated," presumably in its discussion of VARA, MASS MoCA was "entitled to judgment on this count."  565 F. Supp. 2d at 261.

The court also remarked, however, that since Büchel "would have suffered a violation of no right recognized by this statute, this messy situation simply fell outside the boundary of VARA and, a fortiori, outside the more general provisions of the Copyright Act." Id. at 260. This statement reflects a misreading of the Copyright Act. As we have explained, the moral rights granted to specific artists under VARA are separate and independent from the economic rights guaranteed by section 106. 17 U.S.C. § 106A(a) (providing that rights of attribution and integrity are "independent of the exclusive rights provided in section 106"). Thus, the inadequacy of claims under VARA does not, on its own, signify the inadequacy of more traditional copyright claims. See Wu, supra, at 164 (observing that VARA has "acquired the attributes of a false talisman," both because artists overly rely on it in "instances where economic rights, including traditional rights of copyright provided by Section 106 . . . would more effectively protect their interests" and also because courts tend to view VARA claims as "devalu[ing] entitlements to economic rights pleaded in tandem with VARA claims").

We thus turn specifically to this claim. The Museum argues that Büchel has failed to present a triable issue of fact on his claim under section 106(5) because the unfinished work was never publicly displayed. However, as we have described in the context of our VARA discussion, there is significant record

-54-

evidence suggesting that the work was repeatedly and deliberately exhibited to numerous individuals.[23]

MASS MoCA also asserts an affirmative defense under section 109(c), which provides that "the owner of a particular copy lawfully made under this title, or any person authorized by such owner, is entitled, without the authority of the copyright owner, to display that copy publicly."  17 U.S.C. § 109(c).  The Museum argues that it owned the physical copy of "Training Ground," and that section 109(c) therefore permitted it to display the unfinished work.  Here again, however, the record reveals disputed issues of fact with respect to whether the Museum's copy was "lawfully made," as it may have been created in violation of the artist's rights under VARA.  Moreover, Büchel introduced evidence to rebut the Museum's assertion that "the installation's various components" all belonged to, or were purchased by, MASS MoCA.  Finally, Büchel presented evidence that the Museum understood that the physical copy of the installation belonged to him.[24]

_____

[23] In addition to the journalists and Museum personnel noted earlier, a newspaper reported that the mayor of North Adams had seen the exhibit twice, once with Governor Deval Patrick.  See Behind doors, a world unseen, supra.

[24] For example, in an email sent on September 11, 2006 to curator Nato Thompson, the Museum's director (Joseph Thompson) said: "I assume you've already laid out the general idea [to Büchel] (we build it, and it belongs to you)," and also noted that Büchel had the right to "sell all or part of it."  The Museum's proposed contract, which was never signed, would have conferred ownership on Büchel.  It stated that, "[u]pon termination of the exhibition, the fabricated work shall be owned outright by you,

Accordingly, viewing the evidence in the light most favorable to Büchel, we cannot say that a reasonable jury could not conclude that the Museum violated his exclusive right to publicly display "Training Ground for Democracy."

## B. Derivative Works

The Copyright Act also grants artists the exclusive right to "prepare derivative works based upon the copyrighted work." 17 U.S.C. § 106(2). A derivative work is defined as one "based upon one or more preexisting works," such as a translation, musical arrangement, fictionalization, "or any other form in which a work may be recast, transformed, or adapted." 17 U.S.C. § 101. A derivative work includes any work "consisting of editorial revisions, annotations, elaborations, or other modifications which, as a whole, represent an original work of authorship." Id. Büchel brought two claims based on this provision, asserting that MASS MoCA created unauthorized derivative works based on the installation itself and on the work's models and plans.

The district court ruled that, "[e]ven assuming that the stumbling, and eventually abandoned, process of collaboration during 2006 produced an original work of art subject to copyright protection, which is highly doubtful, clearly no 'derivative' work of art was created by MASS MoCA's attempt (however flawed) to play its part in this process." 565 F. Supp. 2d at 261. It further

including all copyrights and related preparatory materials."

rejected Büchel's argument that, by placing tarpaulins over the unfinished installation, the Museum created a separate, unauthorized derivative work.  Id.

On appeal, Büchel summarily argues that what the Museum displayed in Building 5, both with and without the yellow tarpaulins, "recast" or "transformed" the work that he had originally set out in his plans and left behind in December 2006, thus creating derivative works under the Copyright Act.[25]  In response, MASS MoCA again argues that its staff was following Büchel's instructions when working on "Training Ground" in his absence, and that the Museum therefore was merely executing Büchel's vision rather than exercising its own artistic judgment to create a new, derivative artwork.

A derivative work within the meaning of the Copyright Act "consists of a contribution of original material to a pre-existing work so as to recast, transform or adapt the pre-existing work," and the variation from the original must be "sufficient to render the derivative work distinguishable from its prior work in any meaningful manner."  Nimmer, supra, § 3.03[A]; see also Schrock v. Learning Curve Int'l, Inc., 586 F.3d 513, 520-21 (7th Cir. 2009); Woods v. Bourne Co., 60 F.3d 978, 990 (2d Cir. 1995).  As we have

_____

[25] Our analysis of the right-of-integrity tarpaulin claim disposes as well of Büchel's contention that covering the installation constituted a modification of the original work that resulted in the creation of a derivative work.

held, Büchel's contention that his work was modified without his permission and to his detriment gives rise to a right-of-integrity claim under VARA.  Every modification of a work of art does not, however, result in the creation of a derivative work.

In Büchel's 52-page opening brief, there is one paragraph that purports to analyze the derivative work claim, and that paragraph itself is largely descriptive rather than analytical. Büchel cites no cases and does not explain how the modified "Training Ground" was sufficiently original and distinctive within the meaning of the Copyright Act to qualify as a derivative work. His reply brief adds another paragraph, citing cases, but he again asserts in summary fashion that the modifications resulted in a derivative work.  He states that the degree of creativity needed for a derivative work is minimal, but does not explain how the Museum's alterations create a new work that, as a whole, meets the Copyright Act's originality requirement.  The law applicable to derivative work claims, particularly as it intersects with VARA's protection for works of  visual art, is complex.  See, e.g., Lee v. A.R.T. Co., 125 F.3d 580, 582-83 (7th Cir. 1997); Henry Hansmann, Authors' and Artists' Moral Rights: A Comparative Legal and Economic Analysis, 26 J. Legal Stud. 95, 114-116 (1997).  Büchel's undeveloped argument is so perfunctory that we deem the claim waived.  See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (stating that, on appeal, "issues adverted to in a

perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived").

## V.

We summarize our holdings:

1. VARA's protection of an artist's moral rights extends to unfinished creations that are "works of art" within the meaning of the Copyright Act;

2. The right of integrity under VARA protects artists from distortions, mutilations or modifications of their works that are prejudicial to their reputation or honor, and prejudice must be shown for both injunctive relief and damages;

3. Büchel has adduced sufficient evidence to raise a genuine issue of material fact as to whether MASS MoCA violated his right of integrity on one of his three asserted bases for liability, namely, by modifying "Training Ground" over his objections in a manner that harmed his honor or reputation. His right-of-integrity claims based on the yellow tarpaulins and the mere display of "Training Ground" lack merit;

4. Büchel's right-of-attribution claim is moot, as VARA provides only injunctive relief to protect the right of attribution and the installation no longer exists;

5. The record reveals a genuine issue of material fact as to whether MASS MoCA violated Büchel's exclusive right under section 106(5) of the Copyright Act to display his work publicly;

6. Büchel fails to adequately develop his claim that MASS MoCA violated his exclusive right under section 106(2) to prepare derivative works based on "Training Ground," and that claim is therefore waived.

We thus remand the case for further proceedings on Büchel's remaining right-of-integrity claim under VARA and his public display claim under section 106 of the Copyright Act.

Affirmed in part, vacated in part, and remanded for further proceedings consistent with this decision. Each party is to bear its own costs.