# United States Court of Appeals
## For the First Circuit

No. 10-1177

HARTFORD FIRE INSURANCE COMPANY; FEDERAL INSURANCE COMPANY,

Plaintiffs, Appellants,

v.

CNA INSURANCE COMPANY (EUROPE) LIMITED;
CNA INSURANCE COMPANY LIMITED,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Joseph L. Tauro, U.S. District Judge]

Before

Torruella, Ripple,[*] and Lipez,

Circuit Judges.

John J. McGivney, with whom David Stanhill and Rubin and Rudman LLP were on brief, for appellants.
Kristen V. Gallagher, with whom Christopher R. Carroll and Carroll McNulty & Kull L.L.C. were on brief, for appellees.

January 27, 2011

---

[*]    Of the Seventh Circuit, sitting by designation.

**LIPEZ, <u>Circuit Judge</u>**.  After plaintiffs Hartford Fire Insurance Company ("Hartford") and Federal Insurance Company ("Federal") settled a wrongful death suit, they sought equitable contribution from the defendants, CNA Insurance Company (Europe) Limited ("CNA Europe") and CNA Insurance Company Limited ("CNA Limited"),[1] for the amounts paid to defend and settle that underlying action.  Interpreting the critical phrase "arising out of" in the context of the relevant insurance policy, the district court held that the defendants were not obligated to contribute, and granted summary judgment in their favor.

The plaintiffs appeal, arguing that the court's interpretation was incorrect and that, given the facts surrounding the decedent's death, the policy requires the defendants to contribute to the defense and settlement costs.  We conclude that, even under the plaintiffs' construction of the phrase "arising out of," the defendants are not liable for any contribution.  We thus affirm.

**I.**

**A.  The Underlying Litigation & Procedural Background**

Stephen Custadio, a 53-year-old maintenance supervisor at the Fall River, Massachusetts facility of Roma Color, Inc., was

_____

[1] According to the defendants, CNA Europe merged with CNA Limited in about 2003.  Because the insurance policy at issue was originally issued by CNA Europe, we refer to the defendants jointly as "CNA Europe."

working on a materials lift on November 20, 2003, when the lift jammed and then fell approximately two stories. Custadio was impaled through his eye by a metal pipe and died. In 2005, his widow sued European Colour PLC, of which Roma Color was a subsidiary, alleging negligence and wrongful death. European Colour eventually settled the claims against it for $2,750,000.

Both Hartford and Federal defended European Colour during the Custadio litigation under the terms of two insurance policies. The Hartford commercial general liability policy limited coverage to $1,000,000 per occurrence. Federal issued Roma Color an excess "follow-form" policy, which also covered European Colour, and limited coverage to $5,000,000 per occurrence. In accordance with those policies, Hartford paid $1,000,000 toward the Custadio settlement and Federal paid $1,700,000.[2] Hartford also incurred legal fees of $293,188.63 in defending European Colour.

In addition to the Hartford and Federal policies, European Colour was insured by CNA Europe. The CNA Europe policy provided coverage up to £2,000,000 per occurrence for "liability in respect of personal injury . . . happening anywhere within the United States of America . . . arising out of business visits by directors or non-manual employees" who ordinarily reside in the United Kingdom.

---

[2] The remaining $50,000 was paid on behalf of L.K. Goodwin Co., a company that had maintained the lift but was not a party to the Custadio litigation.

While the Custadio litigation was pending, counsel for Hartford and Federal sought contribution from CNA Europe for both the costs of defending European Colour and any potential liability. CNA Europe refused to contribute. It maintained that its policy did not cover Mr. Custadio's accident because, while European Colour employees made numerous business visits to the United States, the accident did not "aris[e] out of" those visits.

## B. Factual Background

The following facts are undisputed; we view them in the light most favorable to the appellants, Hartford and Federal. Galera v. Johanns, 612 F.3d 8, 10 n.2 (1st Cir. 2010).

The business visits underlying Hartford's and Federal's claims occurred during the four years preceding the accident. Although the record reflects over seventy visits by approximately twenty European Colour personnel during that time period, the appellants focus our attention on the visits of four directors: Phillip Myles, European Colour's Chief Operating Officer; Michael Cooper, the environmental manager at EC Pigments, Ltd., a European Colour subsidiary; Neil McKinlay, European Colour's Supply Chain Director; and George Hughes, European Colour's Managing Director.

### 1. Phillip Myles

Myles visited the Fall River facility approximately eighteen times between February 2000 and July 2003. He was responsible for overseeing health and safety at the facility, and

he observed several issues there that concerned him. During approximately three of his six visits in 2001, Myles spoke with Michael Clayton and John White, Roma Color's general manager and technical director, respectively, about the materials lift.[3] At that time, Clayton requested that money be spent on the lift. By February 2003, Myles had drafted a budget that included a capital expenditure for a "replacement lift" that was "needed for safety reasons," but it is unclear whether this proposal referred to replacing the receiving lift or the materials lift.[4] The budget

_____

[3] During that period, there were at least three lifts at the Fall River plant. One, the "receiving lift," extended from the first floor to the second floor and was used primarily to move raw materials from the receiving area to the storage area. The second, the "materials lift," extended from the first floor to the third floor and was used to move both finished product and materials that were being processed. The "press room lift" carried finished pigment, in press cake form, between the basement and first floor.

[4] During his deposition, Myles stated that he budgeted $90,000 for the receiving lift. Later, when viewing an exhibit, he stated that the capital expenditure plan included a replacement for the receiving lift, "needed for safety reasons," for £96,000. When reviewing the same document, George Hughes, European Colour's Managing Director, first said that the £96,000 was intended to replace the materials lift. Later during the same deposition, Hughes said that the budgeted amount was for the receiving lift, not the materials lift. He also indicated, in a subsequently prepared errata sheet, that his first answer had been incorrect, and that he had meant to say that the money was for the receiving lift.

For purposes of its summary judgment order, the district court accepted that this evidence supported the contention that the budget entry related to the materials lift, not the receiving lift. On appeal, the appellants state that their argument does not depend upon that inference. That is so because they focus on the culpable omissions of the four European Colour directors. Under that theory, if Myles's capital request related to the materials lift, the omission was Myles's failure to take the request to the

item was never proposed to the European Colour board, whose approval was required for any expenditures over $10,000.

## 2. Michael Cooper

In 2002, Myles conducted a preliminary health and safety review and then recommended to the European Colour board that a full audit be conducted by Michael Cooper, the environmental manager at EC Pigments, Ltd., a European Colour subsidiary. Cooper visited Fall River in February 2003 and spoke with Clayton. Clayton commented that he would rather spend money on "a new elevator"[5] than on an ice bin, another proposed investment, but Cooper did not inquire further. Cooper recorded the comment in a preliminary report but did not mention it to Myles or the European Colour board.

## 3. Neil McKinlay & George Hughes

Neil McKinlay, European Colour's Supply Chain Director, and George Hughes, European Colour's Managing Director, visited Fall River from October 6 to 10, 2003, at which time McKinlay conducted a broad health and safety review of the facility. McKinlay's most important responsibility during the trip was to ensure that the facility's safety procedures were sufficient to

---

European Colour board for approval. If the budget item was related to a different lift, Myles's culpable omission was failing to respond to Clayton's concerns about the materials lift.

[5] It is unclear from the record whether Clayton was referring to building an additional elevator or replacing an existing elevator and, if so, which one.

prevent accidents to employees. This goal was part of the "Zero Standards" program introduced by Stephen Smith, chairman of the European Colour board, which dictated that the only acceptable number of accidents was zero.

At the time of his visit, McKinlay was aware of a January 2002 incident in which the emergency braking device on the materials lift had failed. He also knew that the lift had been repaired, inspected, and placed back into service. He had not been told, however, that the lift had fallen again in September 2003, shortly before his visit, and indeed did not discover that fact until years later, at his deposition in the Custadio lawsuit. During the visit, both Clayton and Nadilio Almeida, Custadio's supervisor at Roma Color, told McKinlay that they wanted to replace the materials lift, in order both to increase capacity and improve safety. Despite the requests and McKinlay's duty to review the safety at the facility, he did not inspect or inquire about the materials lift's emergency braking device. Moreover, McKinlay knew that Custadio maintained the lift and was the most knowledgeable among the Fall River personnel about its condition, but the two did not discuss it.

During the return trip to the United Kingdom, on approximately October 10, 2003, McKinlay told Hughes that there had been a request for a large capital expenditure to add an additional lift at the Fall River facility. McKinlay advised that another

lift was unnecessary, however, and that spending $100,000 on a new one was wasteful. After he returned, McKinlay discussed several of the facility's safety issues with Smith, the chairman of the European Colour board, but McKinlay did not mention the materials lift.

## II.

The plaintiffs moved for partial summary judgment and the defendants cross-moved for summary judgment. In granting the defendants' motion, the district court construed the phrase "arising out of" in the CNA Europe policy to require "a strong and close causal connection with some specific conduct on the part of the director when involved in a business visit," and found that Hartford and Federal "failed to articulate any colorable causal connection, let alone a strong and close connection, between Mr. Custadio's accident and business visits by European Colour directors and non-manual employees." Hartford Fire Ins. Co. v. CNA Ins. Co. (Europe), 678 F. Supp. 2d 1, 11 (D. Mass. 2010).

We review de novo the district court's grant of summary judgment. Mass. Museum of Contemporary Art Found., Inc. v. Büchel, 593 F.3d 38, 52 (1st Cir. 2010). "'The presence of cross-motions neither dilutes nor distorts this standard of review.'" Id. (quoting Scottsdale Ins. Co. v. Torres, 561 F.3d 74, 77 (1st Cir. 2009)). Rather, where the parties filed cross-motions for summary judgment, as they did here, we must determine based on the

undisputed facts whether either the plaintiffs or the defendants deserve judgment as a matter of law.  Id. (citing Littlefield v. Acadia Ins. Co., 392 F.3d 1, 6 (1st Cir. 2004)).  "We will uphold the entry of summary judgment if the record, evaluated in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Harrington v. City of Nashua, 610 F.3d 24, 27-28 (1st Cir. 2010) (citing Fed. R. Civ. P. 56(c)(2)).[6]

## A.   The Dunthorne Construction of "Arising Out Of"

The parties agree that the phrase "arising out of" should be interpreted according to English law.[7]  There are two strains of English law construing the phrase "arising out of."  The district court held, and appellees agree, that the phrase is properly understood through the lens of Scott v. Copenhagen Reinsurance Co.

---

[6] Rule 56 was amended effective December 1, 2010.  The standard for granting summary judgment now appears in subsection (a), but remains substantively the same.  See Fed. R. Civ. P. 56 advisory committee's note; see also Godin v. Schencks, No. 09-2324, 2010 WL 5175180, at *9 n.19 (1st Cir. Dec. 22, 2010).

[7] Moreover, the CNA Europe policy provides that it "is governed by and shall be construed in accordance with English law." As we are a federal court sitting in diversity, we apply the forum state's choice of law rules.  Montalvo v. Gonzalez-Amparo, 587 F.3d 43, 46 (1st Cir. 2009).  In this case, the forum state is Massachusetts, which, absent any contravening public policy, honors choice-of-law provisions in contracts.  Ahern v. Scholz, 85 F.3d 774, 781 n.2 (1st Cir. 1996); Hodas v. Morin, 814 N.E.2d 320, 324-25 (Mass. 2004).  We discern no reason to reject the parties' choice of English law.

(UK), [2003] EWCA (Civ) 688, (2003) 2 All E.R. (Comm.) 190. Appellants maintain that Dunthorne v. Bentley, [1999] Lloyd's Rep. I.R. 560, is more on point.

In Scott, the court concluded that the theft of a Kuwait Airways fleet and the destruction of a British Airways plane were not losses "arising from one event," namely Iraq's invasion of Kuwait and closure of Kuwait International Airport. [2003] EWCA (Civ) 688, [83]. The court held that the phrase "arising from one event" requires a "significant causal link," which was not present in that case. Id. at [68].

In Dunthorne, the insured's car ran out of gas on the side of a road. [1999] Lloyd's Rep. I.R. at 561. After an acquaintance pulled over on the opposite side, the insured ran across, presumably to get help. The claimant, who was driving on the road, hit the insured and suffered injuries. The insured was killed. The court concluded that the claimant's injuries "ar[ose] out of the use of the [insured's] vehicle." Id. at 561. The court explained that the phrase "'arising out of' contemplates more remote consequences than those envisaged by the words 'caused by,'" but "'excludes cases of bodily injury in which the use of the vehicle is a merely casual concomitant, not considered to be, in a relevant causal sense, a contributing factor.'" Id. at 562 (citing Gov't Ins. Office of New S. Wales v. Green & Lloyd (1965) 114

-10-

C.L.R. 437, 447 (Aust.)).[8]  Given the absence of the "significant causal link" standard adopted in Scott, appellants argue that Dunthorne imports a more expansive view of causation into the "arising out of" language of the insurance contract, and should apply here.

We need not decide which interpretation of the phrase "arising out of" applies here as a matter of law.  Instead, we conclude that Custadio's injuries and death did not "aris[e] out of business visits by directors or non-manual employees," even assuming the application of appellants' broader construction of the phrase.  Under the Dunthorne construction, the business visits must have been not only a contributing factor to the accident, but they also must have been a contributing factor "in a relevant causal sense."  Here, the evidence proffered by appellants does not establish the necessary degree of causation.

As a majority of the English court acknowledged, the facts of Dunthorne "put [the case] close to th[e] line" demarcating

_____

[8] In Dunthorne, the court construed the phrase "arising out of" in the context of the Road Traffic Act, 1988, c. 52, § 145(3)(a), which required vehicle users to be insured against liability for death or injury "caused by or arising out of the use of the vehicle."  [1999] Lloyd's Rep. I.R. at 561.  Appellees suggest that this context makes the Dunthorne opinion inapplicable to the case at bar, which involves the use of "arising out of" in an insurance contract.  Although we appreciate the difference in context, it is unnecessary to delve into the issue further because, as we explain, we do not hold that Dunthorne applies, but rather that, even if it is the applicable standard, appellants cannot prevail.

the boundaries of the phrase "arising out of."  Id. at 563
(Hutchison L.J.); id. (Pill L.J.) (explaining that the facts make
it a "difficult" case and that "[f]inding in the plaintiff's favour
. . . has the danger of opening the door to situations that fall on
the other side of the line"); see also Slater v. Buckinghamshire
Cnty. Council, [2004] EWHC 77, [118] (stating that, in Dunthorne,
the insured's "actions only just fell within the right side of the
line of 'arising out of the use of the vehicle'").  As the court in
Dunthorne explained:

> The reason for a pedestrian to be in the road is or
> may be relevant when deciding whether what occurred arose
> out of the use of the car, but the mere activity of
> crossing the road must not be looked at in isolation.
> There may be many reasons for a pedestrian to cross the
> road.  In each case how the act of crossing the road is
> categorised and whether it can be said to arise out of
> another activity is to be judged objectively looking at
> all the circumstances including the reason why the
> pedestrian was there.

[1999] Lloyd's Rep. I.R. at 562.  The court concluded that "[t]he
plaintiff's injuries were caused by [the insured] seeking help to
continue her journey.  They arose out of her use of the car as she
would not have crossed the road if she was not out of petrol and
seeking help to continue her journey." Id. at 563.

Thus, in Dunthorne, the court relied on the proximity of
the injuries, in both time and space, to the use of the car.  The
court found that the former arose out of the latter because the
insured was in the road next to her car, immediately following the

-12-

use of the car, in order to facilitate the continued use of the car.

**B.  Application of the _Dunthorne_ Construction**

Appellants argue that European Colour directors failed in their safety-related duties during their business trips to the Fall River facility, and that the accident arose from these failures within the meaning of the insurance policy.  As noted, they adduced evidence of several trips by Myles, Cooper, McKinlay, and Hughes, each of whom had certain responsibilities for safety at the Fall River facility.  According to appellants, some of those individuals became aware of concerns regarding the safety of the materials lift or, despite a duty to become aware of such concerns, failed to do so.  Those individuals then failed to report safety issues relating to the materials lift to European Colour's board, which would have been ultimately responsible for making a capital expenditure over $10,000 to repair or replace the lift.  Appellants argue that "European Colour's senior management and board were entirely dependent upon information learned on business visits and conveyed by McKinlay and Cooper," and thus, "when exercising its control over capital expenditures for health and safety at Roma Color . . ., European Colour was deprived of material information" by European Colour directors who made business visits to the Fall River facility.

As the district court explained, however, this argument "conflate[s] questions of liability and causation." Hartford Fire Ins. Co., 678 F. Supp. 2d at 13. Even if the evidence showed that there were failures to appreciate safety issues relating to the materials lift, or failures later to communicate concerns about the materials lift developed during business visits, the question is not whether the accident arose in part out of such omissions (the liability question), but rather whether the accident arose out of a business trip within the meaning of the policy (the insurance question).

There is little doubt that the evidence adduced by the appellants would at least raise a genuine issue of material fact regarding the liability of European Colour for the accident. Without delving into the appropriate legal standard for liability, the evidence shows that four European Colour directors had various responsibilities regarding the safety of Roma Color employees at the Fall River facility. Myles was directly responsible for health and safety at the facility, Cooper was sent specifically to perform a safety audit there, and McKinlay conducted yet another health and safety review. Both Myles and Cooper were alerted by Clayton to some concerns regarding the materials lift, and McKinlay was also aware of requests for a capital expenditure on a new lift, but concluded that spending the money would be wasteful. Each of these acts and omissions arguably had some causal effect upon the state

of the materials lift on the date of Custadio's accident, and thus implicated the liability of European Colour for that accident.

The insurance question requires a different analysis of the same evidence. It turns not on the culpability of the European Colour directors for the accident, but rather on the relationship between the accident and the business visits of European Colour directors to the Fall River facility, and whether that relationship is sufficiently close to trigger coverage under the CNA Europe policy. In Dunthorne, the question was not whether the insured should have crossed the road or should have filled her gas tank, and whether the accident arose out of her culpable act or omission. Answers to those inquiries would resolve the issue of whether the insured (or her estate) was liable for the other driver's injuries. Indeed, the estate "admitted that the claimant's injuries had been caused by [the insured]'s negligence." [1999] Lloyd's Rep. I.R. at 560. Rather, the question was whether the accident and resulting injuries arose out of the use of the car -- the covered activity.

In finding that the accident arose out of the use of the car, the court relied on the close relationship of the accident to the covered activity. The accident took place while the insured was still engaged in using -- or trying to use -- the car. The insured had just run out of gas and crossed the road to obtain help so she could continue using her car. Even with this proximity in time and place between the covered activity (use of the car) and

-15-

the accident, the facts in Dunthorne "put [the case] close to th[e] line" marking the outer boundary of the "arising out of" language. [1999] Lloyd's Rep. I.R. at 563 (Hutchison, L.J.).

Here, the accident and the business trips to the Fall River facility are connected by a tangled web of facts, many of which are remote in time and place from the accident. The directors took business trips to the Fall River facility, during which they received (or failed to elicit) information about the materials lift. They then made certain decisions -- both during the trips and after -- about what to report to the European Colour board in the United Kingdom, where decisions about the repair or replacement of the lift would be made. In making any determination regarding the lift, the board had a number of pieces of information before it, including those gleaned from visits by other directors both before and after the visits at issue, and it had to weigh the need for a new lift with other fiscal demands. Thus, even with a focus on the relationship between the accident and critical decisions by the United Kingdom board of directors about the repair or replacement of the materials lift, any action or inaction that took place during a business visit by European Colour directors had a causal relationship to the accident only in combination with a number of other interrelated facts of varying import for the accident. In sum, for the purpose of insurance coverage, the causation in this case is too complex and attenuated to fit within

the "arising out of" confines of <u>Dunthorne</u>, and hence the business visits were not a contributing factor to the accident "in a relevant causal sense."  <u>Id.</u> at 562 (citing <u>Gov't Ins. Office of New S. Wales</u> 114 C.L.R. at 447).  Thus, the CNA Europe policy did not cover European Colour's liability for the Custadio litigation.

<u>Affirmed</u>.